## Ex Parte Samuel Blumer.

The word resident is ordinarily used to designate persons in a particular locality, as of a city, town or county.

The word " residents," in the conscript laws, is used to designate a class within the whole limits of the government.

The term " residents," as used in the conscript laws, includes not only citizens, native and naturalized, but also foreigners whose residence in this country has been such as to attach to them a national character, as members of society.

The inhabitants, as distinguished from citizens, are strangers who are permitted to settle and stay in the country—bound by their residence to the society ; they are subject to the laws of the State while they reside here, and they are obliged to defend it.   Such are the foreigners intended to be embraced by the term " residents," used in the conscript laws.

Such a residence, it is believed, will generally be found to correspond with what is meant by domicil, as it is now understood and adjudged by the courts of England and America.

An act of Congress ought never to be construed to violate the law of nations, if any other possible construction remains.

The rule adopted by the President, that foreigners, not domiciled in the Confederate States, are not liable to enrollment, is in harmony with the law of nations ; is based upon an undoubted and recognized right, and is one of certainty and safety.

The domicil of birth remains a party's domicil until a new one is acquired.

A person being at a place, is *prima facie* evidence that he is domiciled there, and it lies upon him to rebut that presumption, when the place of his domicil is brought in question.

This presumption may be rebutted by the party showing that the facts connected with his residence are not inconsistent with a *bona fide* intention, on his part, of not making the place of residence his domicil, or of retaining his former domicil.

Declarations of a party's intention in relation to his domicil, are admissible as part of the *res gestæ*.

Such declarations are to be credited when not unreasonable in themselves, not inconsistent with other facts, and not under circumstances creating suspicion of insincerity.

In most cases of domicil, the question of intention is made to depend upon declarations, in proportion as they tend to explain, and are not inconsistent with the other facts.

When it is once established that a foreigner has finally abandoned his domicil of origin for the purpose of settling here, and does arrive and fix his abode here, his frequent removals from one place to another would not prevent his domiciliation in this country ; and any declarations that he might make afterwards of his intention to return to his native home, would amount to nothing, unless accompanied by the act of returning, or something tantamount thereto.

Sickness and pecuniary destitution may assist other facts in rebutting the *prima facie* evidence arising from a party's being in a country, in a question of domicil.

A general residence might be acquired *by lapse of time,* from an accidental detention, continued by the misfortunes and necessities of a party.

APPEAL from the judgment of Hon. James H. Bell, associate justice of the Supreme Court, sitting in chambers, at Austin.

On *habeas corpus.* The applicant appealed from the order of the judge at chambers, remanding him to the custody of his commanding officer.

The facts appear fully in the opinion of the court.

*M. H. Bowers,* for the appellant.

*C. L. Robards* and *J. B. Morris, contra.*

ROBERTS, J.—The question in this case, is whether or not the appellant, Samuel Blumer, a native of Switzerland, is liable to enrollment as a conscript, after a residence or sojourning of three years in the Confederate States, as exhibited in the statement of facts as follows, to-wit :

" The applicant, Samuel Blumer, is a native of Glarus, in the Republic of Switzerland. He came to Texas on business in 1854, and remained here a few months, when he returned to his native home in Switzerland. A portion of the time he was in Texas, he worked as a day-laborer for R. H. Peck, at the butcher business. In December, 1858, he again left home to come to Texas, traveling by way of Paris, Havre (passing through New York on the 7th day of June, 1859,) and New Orleans, stopping at these and other places, and arriving in Texas on the 24th day of June, 1861. He was sick when he reached here, and remained in bad health

for about two years —able to work a month or two, and then sick for a month or two, and did work when able to do so. Since he recovered his health, he has performed manual labor for different persons for pay, such as splitting rails, butchering and working on a farm, and following the ordinary avocations of the country, and was so employed at the time of his enrollment. On his arrival in Texas, he said he had not come to make this his home, and declared his intention not to remain in Texas, but to return again to Switzerland as soon as as he recovered his health sufficiently to travel, and got money enough. That since he recovered his health in 1863, he has been destitute of means, and has continuously and often expressed his determination to leave Texas, and to return to his native home to live as soon as he earned money enough to defray his expenses in traveling from here there; but never stated any particular time when he would start, nor has he, since his return to Texas, ever put himself in motion to leave the State, or manifested, by any act done, an immediate intention to start at any time, during that time. That he has never declared his intention to become a citizen of the Confederate States; has never voted at any election, but has, at all times, refused to take any part in elections, alleging, as a reason therefor, that he was not a citizen of the country. He has never purchased property here, or invested money in business. He is a single man, and is thirty-two years old.

"He was enrolled as a conscript on the 2d day of July, 1864, by Capt. John Rapp, enrolling officer of Travis county, and by him assigned to the respondent officer , Lieut. E. M. Green, recruiting officer for Waterhouse's Brigade,) for service in the army of the Confederate States."

The laws of conscription embrace all white men of his age, who are " residents of the Confederate States." A resident is " one who resides or dwells in a place for some time." To reside, is to " dwell permanently or for a length of time, to have a settled abode for a time." To dwell, is " to abide as a permanent resident, or to inhabit for a time, to live in a place, to have a habitation for some time or permanence." It invariably involves the idea of the present home of the person, whether it is designed to be per-

manent or temporary, or for general or special purposes.   In view
of the different significations which may attach to it, from the va-
rious circumstances which may be connected with and qualify this
central idea of *present home*, its true meaning, in this or any
other case, must be arrived at by considering the manner or mode
in which it is used, and the subject matter to which it is applied.
Here it is used by the Congress of the Confederate States in a
general law; the object of which is to compel persons to render
military service in defence of the organized government.   The
government could hardly be presumed to intend to compel a per-
son to render military service, who is not under obligation, as a
*duty*, to serve the country when called upon.   Compulsion, in a
just and enlightened government, implies duty on the part of the
one compelled.   Congress supposed that there might be some
" white men between the ages of seventeen and fifty," who might
not be under such obligation, although they might be found within
the territory of the Confederate States—such as foreigners, so-
journing here on temporary or transient business, or visiting the
country for health or pleasure; which is indicated by adding as
a limiting qualification, the terms " residents of the Confederate
States."   The word residents is ordinarily used to designate per-
sons in a particular locality, as of a city, town or county, and not,
as in this case, to designate a class within the whole limits of the
government.

   Congress designed that this term should include more than citi-
zens, native and naturalized, otherwise the word citizen would have
been used.   It includes also foreigners, not naturalized, whose
residence here has been such as to attach to them a national char-
acter as members of society, and who are thereby under obliga-
tions to defend the country.

   Vattel says, "The inhabitants, as distinguished from citizens,
are strangers who are permitted to settle and stay in the country.
Bound by their residence to the society, they are subject to the
laws of the State whilst they reside there; and they are obliged
to defend it, because it grants them protection, though they do
not participate in all the rights of citizens."   Such are the for-
eigners intended to be embraced by the term " residents."   They

47*

are strangers who *settle and stay in the country.* After they shall have settled, made it their home, their place of abode, the time they shall have stayed, or intended to stay, is not defined; but while they do reside there they are bound to defend it. (Vattel, p. 160.)

Such a residence, it is believed, will generally be found to correspond with what is meant by domicil, as it is now understood and adjudged, by the courts of England and America. Descriptions of domicil are more easy and not less intelligible than efforts at a definition of it. In the case of Bruce v. Bruce, in the House of Lords, the Chancellor, Lord Thurlow, said, "But what will make a person's *domicil* or home—must occur to every one. A British man settles as a merchant abroad; he enjoys the privileges of the place; he may mean to return when he has made his fortune; but he dies in the interval; will it be maintained that he had his domicil at home?" (Bosanquet & Puller's R., 229 and note.)

Justice Washington in the Venus case, says, "If it sufficiently appear that the intention of removing was to make a permanent settlement, or for an indefinite time, the right of domicil is acquired by a residence even of a few days." (8 Cranch R., 279.)

Story says, "In a strict and legal sense that is properly the domicil of a person where he has his true, fixed and permanent home, and principal establishment, and to which, whenever he is absent, he has the intention of returning." (Story Conf. of Laws, 49.) Again he says, "Two things must concur to constitute domicil; first residence, and secondly the intention of making it the home of the party." (Id., 53.) And again he says, "Vattel has defined domicil to be a fixed residence in any place, with an intention of always staying there. But this is not an accurate statement. It would be more correct to say, that that place is properly the domicil of a person in which his habitation is fixed, without any present intention of removing therefrom." (Id., 52.)

This view of Vattel, as to the intention of *always* remaining, which is alleged by Justice Story to be erroneous, accounts for his considering only perpetual inhabitants to be domiciliated, and not inhabitants simply "who are permited to settle and stay in the

country." Justice Story's interpretation of the meaning of Vat-tel, is that, " Foreigners who reside in a country for permanent or indefinite purposes, *animo manendi*, are treated universally as inhabitants of that country." (Story Conf. Laws, sec. 48, p. 62. See Vattel, sec. 213, 218, 219, pp. 160, 1, 2.)

This will suffice for the affirmative view of the descriptions and definitions of domicil. It must be considered in connection with the facts and presumptions, which may prevent a place from being one's domicil. In the leading case of Bruce v. Bruce, it is said, " A person being at a place is *prima facie* evidence that he is domiciled at that place; and it lies on those who say otherwise, to rebut that evidence. It may be rebutted no doubt. A person traveling—on a visit—he may be there some time on account of his health, or business; a soldier may be ordered to Flanders, and be detained there for many months; the case of an ambassador,'' &c. See also 1 Binney's Penn. Rep., 350 and note.

Justice Catron, in speaking of the domicil of Kosciusko, a native of Poland, and afterwards a resident of France, says, " a removal which does not contemplate an absence from the former domicil, for an indefinite and uncertain time, is not a change of it. But when there is a removal, unless it can be shown or inferred from circumstances, that it was for some particular purpose, expected to be only of a temporary nature, or in the exercise of some particular profession, office or calling, it does change the domicil. The result is, that the place of residence is *prima facie* the domicil, unless there be some motive for that residence not inconsistent with a clearly established intention, to retain a permanent residence in another place." (Ennis v. Smith, 14 Howard U. S. Rep., 428.)

Persons removing to a place for the particular purposes and objects as above expressed, are sometimes styled residents. An example of that is found in the statutes giving attachments and other process against non-residents. Savage, Ch. J., in such case says: "The reason why this remedy is given against the property of debtors resident abroad, is equally applicable, whether the debtor is absent permanently or temporarily." Thus we see the reason and object of the law is made to give character to, and even

modify, the meaning of the term resident: see 1 Wend. Rep., 46, in the matter of Thompson. Other instances might be given, which would only prove the rule that the term must be understood in reference to, and in connection with its subject matter.

Here it is used in reference to the defence of the country, by such persons as should be bound by law, to serve in the army of the Confederate States.

The President, being charged with the duty of enrolling those liable to military service, "in accordance with rules and regulations prescribed by him," through his adjutant and inspector-general, prescribed and published as one of said rules, that "foreigners not domiciled in the Confederate States, are not liable to enrollment." Laws in addition to and amendatory of the original conscript law have been passed, with a full knowledge, we may fairly presume, of such construction by the President; and the same designating words, "residents of the Confederate States," have been repeated therein.

The Hon. Wm. Pinckney Hill, one of the eminent judges of the Confederate States in Texas, in a lucid and elaborate opinion, has vindicated that construction, in the case before him, of Reed v. Drake. This construction is in harmony with the law of nations. (Vattel, 160-1-2; 8 Cranch, 279; see remarks of Sec'y Marcy in the Koszta case, Message and Pub. Doc., 1835, 4 Part. 1, pp. 40, 45.) "An act of congress ought never to be construed to violate the law of nations, if any other possible construction remains." (Murray v. The Charming Betsy, 1 & 2 Cranch R., 143.) The Confederate government, from its first organization to the present time, has had peculiar motives for a strict observance of the laws of nations towards our enemies as well as towards neutrals. For, while it has been seeking to assert and retain the right of constitutional republican government, and when made necessary to maintain it by force of arms, so as to attain a recognized position among the family of nations, our enemies have affected to regard, and sought to treat us, as a disorganized mass of people, following a military leader—not even entitled to the rights of belligerents as long as they could prevent it; while they, being already established, and recognized by the world, could afford, as

they thought, to practice towards us a war of desolation and extirpation not sanctioned by the usages of civilized nations in modern times. (Wheaton's El. of International Law, 394 to 405.)

To require the military services of domiciled foreigners, is an undoubted and recognized right. And therefore the rule adopted by the President, in relation to the enrollment of foreigners, is one of certainty and safety.

We have been shown an order from Brig. Gen. Greer, (Hd. Qtrs. Bureau of Conscription, T. M. Dept.,) prescribing a different rule. This having been issued on the 9th of April, 1864, after the passage of the law of 17th February, 1865, which retains the word "residents," can not be held as evidence of the construction by the President originally, or of congress at any time, however it may be thought to affect and change the duty of enrolling officers, so far as they are to be governed by mere orders irrespective of the law, which is not now before us.

The question now arises upon the statement of facts, where is Blumer's domicil or home? (2 Bos. & Pul. R., 231.) He is a native of Switzerland, came to Texas in 1854, on business, and after remaining a few months returned, and left there again in 1858, to come to Texas. Thus far it may be presumed that Switzerland was the place of his original domicil. For, although it is not shown that his parents were domiciled there at the time of his birth, (Story Conf. Laws 57, sec. 46,) that fact may be inferred from their being there then, in the absence of all other facts on that subject; and it is supported, also, by the fact that he came here on business and returned there, and remained several years, being then a young man without a family, as he still is. "Persons who are born in a country, are generally deemed to be citizens and subjects of that country." (Story Conf. 61, sec. 48; 1 Black Com., 366.) The domicil of birth remains his domicil until another is acquired. (Story Conf. 50-1, sec. 46-7.) "In December, 1858, he again left *home* to come to Texas, traveling by the way of Paris, Havre, (passing through New York on the 7th day of June, 1859,) and New Orleans, stopping at these and other places, and arriving in Texas on the 7th day of June, 1861." Up to that time, he had not changed his domicil. The intention with

which he left home; what he did on the way; why he was de-
tained at Paris, Havre, New York, New Orleans, and other pla-
ces, two years and a half; what he came to Texas for; what business
or connexions he left behind him in Switzerland, do not appear.
In reference to the course of events which had long been taking
place, in drawing the young men of the densely populated coun-
tries of Europe, to find homes in America, to get better wages for
labor, to improve their fortunes, or to earn a livelihood more easily,
it might be inferred that he was an emigrant, who had come to
Texas to settle.    That would be a mere incipient impression, ari-
sing from the previous facts, ready to be brought into requisition
to explain and give force to subsequent conduct, pointing in that
direction.    But of itself such presumption would not be sufficient,
because the intention of remaining permanently, or for an indefi-
nite time, had then neither been expressed or otherwise manifested
by any facts here.    (The Venus, 8 Cranch R., 278–9.)

On the 2d day of July, 1864, a few days over three years after
his arrival, he was enrolled as a conscript in Travis county.
During that time he has lived here, as a laborer on hire, in the
ordinary avocations of the country.   These facts establish *prima
facie*; that this is his domicil, and throws on him the burthen of
showing that his original domicil has not been lost by the acquisi-
tion of a new one.    Lord Thurlow says, " a person's being at a
place is *prima facie* evidence, that he is domiciled at that place."
(Bos. & Pul., 231.)   This is something stronger; for he has—
considering only the above recited facts for the present—done just
as any immigrant, in his condition of life, would have done, who
came here to settle and make Texas his home permanently or for
an indefinite period.    So far as anything is shown, he would have
had to labor or hire, wherever he could get employment, had he
remained in Switzerland.   He had no means to live in any other
way.   He had no family, to require any other mode of settlement.
He had not left behind him any ties, either in his business or his
family relations, to raise an expectation of his return to them.
His all was here, and he was using it to make a livelihood for
himself.   A residence attended by such circumstances, not re-
pelled by others, would fall directly under the definition given by

Rush, president, in the case of Guier & O'Daniel (1 Binney R., 352, note,)—that is: "A residence at a particular place, accompanied with positive or presumptive proof of continuing it an unlimited time." In the same case it is said: "On a question of domicil, the mode of living is not material—whether on rent, at lodgings, or in the house of a friend. The apparent or avowed intention of *constant* residence, not the manner of it, constitutes the domicil." The intention of remaining, (*animo manendi,*) though not avowed, is presumed from a residence under such appearances. (The Venus, 8 Cranch, 278.) This presumption of intention may be rebutted by showing that these facts are not inconsistent with a *bona fide* intention, on his part, of not making this his domicil, or of retaining his former domicil. What facts has appellant shown with that view? They are his repeated declarations, his sickness and his destitution. "He was sick when he reached here, and remained in bad health for about two years; able to work for a month or two, and then sick for a month or two, and did work when able to do so." He worked continually for the last year.

"On his arrival in Texas, he said that he had not come to make this his home, and declared his intention not to remain in Texas, but to return again to Switzerland as soon as he recovered his health sufficiently to travel and got money enough to defray his expenses from here there."

This he repeated continuously and often, without stating any particular time when he would start.

"Since he recovered his health in 1863 he has been destitute of means."

Such declarations were properly admitted as part of the *res gestæ,* and are to be weighed, in connection with the other facts of the case. They are to be credited as the index of his intention, when not unreasonable in themselves, not inconsistent with other facts in the case, and not under circumstances creating suspicion of insincerity. When his declarations were made, on his arrival in Texas, in June, 1861, they were not liable to any of these objections, in reference to any facts that had up to that time transpired. His leaving Switzerland to come to Texas might or might

not have been to settle here.  He had previously come, and stayed a few months, and returned to Switzerland without settling himself here.  His delay of two years and a half on the way, stopping for a time at more than four places, would rather militate against the inference that he had any such specific design.  His stopping temporarily at a number of places, without fixing his abode with any permanence, so far as it appears, rendered it not unreasonable that he should not do so in Texas.  The war had commenced, but the armies were being raised by voluntary enlistment, and not by the compulsion of any one by law.  The force of public opinion could not have borne upon him—he being then a foreigner, just arrived, and being sick and unavailable for the service.  Nor is it probable that a young man in his condition in life would have been then preparing his defence against future compulsory service, by his declarations, or that he ever knew the legal effect or importance of such declarations, or could then anticipate any possible necessity for them.

In the case of Wilburn v. Bennett, 3 Metcalf R., 20, such declarations offered in evidence to prove the intent of a removal from one place to another, having been rejected by the court below, were held to be admissible by the Supreme Court.  (See, also, Thorndike v. City of Boston, 1 Met., 247.)  As to the weight of such testimony, a few cases may be referred to with advantage. In the case of Watson v. Simpson, 8 La. An. Rep., 337, Merrick, C. J., said :  " It is evident that, in most of his conversations, and whenever he had an opportunity to manufacture evidence, Simpson pretended to be a resident of New Orleans, whilst, during the whole of three years he was absent, he was enjoying all of the advantages of a real resident in New York, except voting, and this he seemed to decline, merely because it might affect his Louisiana domicil."   " Courts of justice must look to the real facts of the case, and where it appears that the declarations of a party are made with a reference to making testimony in his favor, they must be rejected."

Justice Catron, in reference to Kosciusko's domicil, after fully discussing this question as to the admissibility and weight of such evidence in France, England and America, and the practice of re-

ceiving it, says: "We must, from his own declarations and other proofs in the record, receive it as a ·fact that he was domiciled there (in France) at the time of his death." (Ennis v. Smith, 14 Howard Rep., 422–3–4; 8 Pickering, 476; 5 Greenleaf, 266.)

In the case of Horne v. Horne, 9 Iredell Law R., 108, it is said by Nash, J.: "There is one circumstance which, we think, was nearly conclusive upon the question; it is that the deceased, himself, considered North Carolina his domicil. In his will he styles himself "Joel Horne, of Anson county, North Carolina." So the declaration of intention was taken as full proof of it in the case of Leach v. Pillsbury, 15 New Hampshire R., 138.

Justice Washington, in the *Venus case*, said: "If he had made no express declarations on the subject, and his secret intention is to be discovered, his acts are to be attended to as affording the most satisfactory evidence" (as to domicil.) 8 Cranch, 278. Here there is an implication that where there are such express declarations, they demand the first consideration. Indeed, in most of the cases of domicil, the question of intention is made to depend upon declarations, in proportion as they tend to explain, and are not inconsistent with the other facts. There are many American cases relating to the settlement of paupers, and the acquisition of jurisdiction by residence and the like, which may be referred to for the purpose of explaining the migratory and unsettled state of many persons who are to be found in the country, and in which their residence has been so transient and unfixed for years, as to compel the alternative of a resort to the original domicil, to give them a domicil at all, (2 Maine R., Turner v. Buckfield, 212, and Knox v. Waldborough, 420,) or of adjudging a domicil or residence to have been acquired upon slight grounds. (Id., Boothbay v. Wiscasset, 354; Putnam v. Johnson, 10 Mass. R., 499; Greene v. Windham, 13 Maine R., 228.)

In the case last cited, it is said by Weston, C. J.: "Whoever removes into a town for the purpose of remaining there an indefinite period, thereby establishes his domicil in that town. It is not necessary that he should go with a fixed resolution to spend his days there. He might have in contemplation many contingencies

which would induce him to go elsewhere. Some persons are more restless in their character and migratory in their habits than others, but they may and do acquire a domicil wherever they establish themselves for the time being, with an intention to remain until inducements may arise to remove." These views are directly applicable to citizens of the country, when the question is raised as to what town, county or State they belong. It is equally applicable, however, to a foreigner of that class, when it is once established that he has finally abandoned his domicil of origin for the purpose of settling here, and does arrive and fix his abode here. The change of domicil, being consummated by the establishment of his abode here, his frequent removals from one place to another would not prevent his domiciliation in this country. And any declarations that he might make afterwards of his intention to return to his native home, would amount to nothing unless accompanied by the act of returning, or something tantamount thereto. (Story Conf. Law, § 59, 60, 8th and 14th rules; also Ib., 62; 8 Cranch, 279.) Hence, in this case, Blumer's stopping at New York, New Orleans and other places, during one whole year, before arriving here, would be a potent circumstance in fixing his domicil in this country, even shortly after his arrival, notwithstanding his declarations or intentions then, if it had been shown that he left Switzerland with the intention of abandoning his domicil of origin, immigrating to the then United States of America, and settling there as a home. But there is no such proof in this case.

In the case of Ex Parte John Luscher, decided at Austin, November 15, 1864, the applicant left Switzerland and came to Texas to settle and make it his home, if he liked the country. "Soon after his arrival here, he declared that he did not like the country, that it was too dry, and he should return to Switzerland." Still he remained in Texas, pursuing the ordinary avocations suited to his condition, within a few months of four years, and had made no ostensible demonstration to carry out any such intention. The court, without attempting any elucidation of the legal principles upon which it acted, decided against the applicant. The intention of abandoning his domicil of origin was established; his condi-

tional intention to make Texas his permanent home, was established, and so was his settlement in the country. To these facts were added a four years' residence, (nearly,) notwithstanding his declarations that he would return to Switzerland, and the absence of any indication of removal. His acts stood in repugnance to his words, in reference to his real situation.

We have already seen that such is not the case with Blumer as to the facts anterior to, and up to the time of his arrival in Texas, when he made the declaration of his intention not to make Texas his home, but to return to Switzerland as soon as he got well enough to travel and made money enough to defray his expenses. How do the facts subsequent to that time, during his three year's residence in Texas, comport with such declaration? The ground assumed is, that he has been prevented by sickness for two years, and since then, by a destitution of means from carrying out his intention as manifested by his words. We are not furnished with the information as to the necessary amount of money that would be required, either ordinarily or in the present state of difficult egress, or of what he did or could make by his work, under the circumstances. It is not improbable that, considering his sickness and the embarrassed condition of the country, he should not have made much money. It is sufficient for the present that the proof, as it stands on the record, shows him to be " destitute of means" during all the time since he recovered his health. These facts are not important, as necessary facts in any other case. For a foreigner, who is here on a visit, or for travel, or on particular or special business, or without business, does not have to show that he will leave as soon as he conveniently can, nor to either intend or declare it. They derive their importance in this case simply from the fact, that their existence is necessary to sustain the truth of his declarations, by which he undertook to manifest his real intention in regard to a home, as between Switzerland and this country.

These facts being proven, his remaining here, as he has done, is not inconsistent with the expressed intention of not making Texas his home and of returning to Switzerland. He is detained by his physical condition and his necessities. These explain why

he is here, when he would be at another place.  When time and opportunity shall have produced a repugnance between the facts and his declarations, which before long they might, then his declarations could not be regarded any longer as a true index to his intention.  But until that occurs his being here is as fully explained as though it were shown that he had come here on a special or particular business, as a traveler or a visitor.  It was said by Lord Chancellor Loughborough, " The actual place where he is, is, *prima facie* to a great many given purposes, his domicil.  You encounter that if you show it is either constrained, or *from the necessity of his affairs*, or transitory ; that he is a sojourner ; and you take from it all the character of a permanency." (Bempde v. Johnstone, 3 Vesey Jr. R., 202.)

In the case of Hoskins v. Mathews, 35 Eng. Law & Eq. Rep., 641–2,) it is said, " That there may be cases in which even a permanent residence in a foreign country, occasioned by the state of the health, may not operate a change of domicil, may well be admitted.  Such was the case put by Lord Campbell in Beattie v. Johnstone, but such cases must not be compared with others in which the foreign residence may be determined by the preference of climate, or the hope or the opinion that the air or the habits of another country may be better suited to the health or the constition.  In the one case the foreign abode is determined by necessity, in the other it is decided by choice."

See also Beattie v. Johnstone, Clark & Fin, 10th vol. R., 139 ; Elbers v. United Ins. Co., 16 John. Rep., 133 ; Brown v. Smith, 71 Eng. Com. Law & Eq. Rep., 9.

"Time," says Sir W. Scott, "is the grand ingredient in constituting domicil."  In most cases it is unavoidably conclusive. It is not unfrequently said, that if a person comes for a special purpose, *that* shall not fix a domicil.  This is not to be taken in an unqualified latitude, and without some respect to the time which such a purpose may or shall occupy ; for if the purpose be of such a nature as may probably or does actually detain the person for a great length of time, a general residence might grow upon the special purpose.  (Wheaton's El. In. Law, 370 ; Story's Conf. Laws, sec. 45, p. 54.)

So that in this case, which for aught that appears is an accidental detention, continued by the misfortune and necessities of the party, a general residence might be acquired by the lapse of time.

The case then stands thus : Blumer being a native of Switzerland, having once been here and gone back, leaves his home to come to Texas—after two years and a half here gets sick, declaring then and continually afterwards his intention not to make Texas his home, and to return to Switzerland as soon as he can do so, but is prevented by his sickness and destitution for three years, during which time he labors upon hire when he can in the ordinary avocations of the country.

The facts which draw him to his original domicil are not strong—far from it. But the residence here is fully explained to be not inconsistent with the declared intention to return, and not to acquire a new one. In the absence of any such declarations, his residence and conduct here might easily rebut any claim he might now make to have retained his original domicil, by the mere fact of being a foreigner. In view of the mode in which he chose to shape his declarations of intention, (not to make this his home, but to return to Switzerland as soon as he was able and got money enough to bear his expenses,) had he not shown that, from sickness and destitution he was not reasonably able to go, his declarations would have been impeached, and being found untrue in part, might have been wholly disregarded as constituting an index to his intention, and his three years' residence and conduct here would have been left in full force to establish a domicil here, and thereby negative any claim to his foreign original domicil, founded, as it would then be, only upon the established fact of his being a foreigner.

His declarations of intention stand now unimpeached by other facts—are not unnatural or unreasonable in themselves, and must turn the scale in favor of Switzerland as his domicil.

Only such facts have been commented upon as have been deemed material to the decision of the case. Such rules of law have been referred to as would exhibit generally the relation between residence and domicil in reference to the subject under consideration,

and as were deemed applicable to the particular facts of this case and necessary to its decision.

Aided by the research and able arguments of counsel on both sides, the subject has received anxious and patient attention and consideration ; and we are of opinion that, upon the facts as presented in the record, the applicant, Samuel Blumer, is not liable to military service in the Confederate States army, and that he should be discharged as " an undomiciled foreigner."

Reversed and discharged.