## M. B. CHASTAIN ET AL V. COOPER AND REED ET AL.

No. A-3818. Decided April 1, 1953.
Rehearing overruled May 20, 1853.
(257 S.W. 2d Series 422)

*Jack T. Life,* of Athens, for petitioner, Chastain.

The Court of Civil Appeals erred in holding that there was sufficient evidence to raise the issue of the apparent authority of the agent Mitcham to bind petitioner Chastain in connection with the purchase of certain articles from the National Supply Company and in rendering judgment for the National Supply Company when there was no evidence to support such judgment. Talley v. Shasta Oil Co., 146 S.W. 2d 802; W. D. Cleveland & Sons v. Houston Sporting Goods Store, 166 S.W. 912;

Wichita Frozen Food Lockers v. National Cash Register Co., 142 Texas 109, 176 S.W. 2d 161.

*Lassater, Spruiell, Lowry, Potter & Lasater* and *Chas. F. Potter,* of Tyler, for petitioner Whiteley-Phillips Drilling Company.

The Court of Civil Appeals erred in holding that there was a novation whereby the written contract between Whiteley-Phillips Drilling Company was substituted for the prior oral contract between Whiteley-Phillips Drilling Company and M. B. Chastain, and that Chastain was released, contrary to the findings of fact, and in reversing and rendering the judgment in favor of Whiteley-Phillips Drilling Company against M. B. Chastain with interest and costs. Pierce-Fordyce Oil Ass'n. v. Woods, 180 S.W. 1181; Weimer v. Price, 246 S.W. 666; Scott v. Atchison, 38 Texas 390.

*Bowyer, Gray, Thomas & Crozier* and *R. W. Gray,* all of Dallas, for Cooper and Reed, *Bryan, Stone, Agerton, Parker, & Kerr* and *G. W. Parker, Jr.,* for National Supply Company, and *Locke, Locke & Purnell,* of Dallas and *Mrs. Olga H. Lapin,* of Kilgore, for respondents.

George Mitcham had authority, or at least apparent authority, to act for M. B. Chastain to employ Cooper and Reed to perform the services sued for. Desdemona Gasoline Co. v. Garrett, 90 S.W. 2d 636; Schaff v. Stripling, 265 S.W. 264; Richards v. United States Cold Storage, 131 Texas 148, 112 S.W. 2d 445.

MR. JUSTICE CALVERT delivered the opinion of the Court.

The opinion of the Court of Civil Appeals, see 250 S. W. 2d 652, contains a detailed statement of the factual background out of which arose all of the controversies involved in this case. Only such facts as are necessary to an understanding and decision of the law questions before this court will be stated in this opinion.

Two applications for writs of error were granted in this case. In the first, Whiteley-Phillips Drilling Company was petitioner and M. B. Chastain was respondent. In the second, M. B. Chastain was petitioner and Cooper and Reed and National Supply Company were respondents.

The question presented by the application of Whiteley-Phil-

lips Drilling Company arises out of this situation: A trial court judgment in favor of Whiteley-Phillips against M. B. Chastain for services rendered under an oral drilling contract has been reversed and a take-nothing judgment rendered by the Court of Civil Appeals on the ground that the evidence establishes as a matter of law that there was a novation of such contract when Whiteley - Phillips entered into a written contract with one Humphrey Marshall under which Marshall agreed to pay for such services. Whiteley-Phillips contends that under the evidence the question of novation was a fact question which the trial court found in its favor and that the action of the Court of Civil Appeals was therefore error.

There is no serious disagreement between the parties as to the legal incidents of a novation. In the absence of such inconsistent provisions of two contracts that both cannot stand, thereby working an implied novation, it is held that a second contract will operate as a novation of a first contract only when the parties to both contracts intend and agree that the obligations of the second shall be substituted for and operate as a discharge of the obligations of the first. Money v. Dameron, Tex. Civ. App., 70 S.W. 2d 291, writ refused; Cooper Grocery Co. v. Strange, Tex. Com. App., 18 S.W. 2d 609; 31 Tex. Jur. pp. 394-397, Secs. 9 and 10. In keeping with this general rule it is held that to effect a novation by the substitution of one debtor for another thereby releasing the first, there must be agreement to that effect between all three parties, and a presumption of an intention to release the first debtor will not arise from the mere taking of the second. Scott, Adm'x v. Atchison, 36 Texas 76, Id. 38 Texas 384-390; Pierce Fordyce Oil Ass'n. v. Woods, Tex. Civ. App., 180 S.W. 1181, 1183, writ refused; Money v. Dameron, Tex. Civ. App., 70 S.W. 2d 291,293. It is not necessary, of course, that a novation be in writing or that it be evidenced by express words; like any other ultimate fact it may be proved as an inference from the acts and conduct of the parties and other facts and circumstances. Commercial Nat. Bank of San Antonio v. Poulos, Tex. Civ. App., 8 S.W. 2d 222, no writ history; Watts Adms. v. Smith, 250 Ky. 617, 63 S.W. 2d 796, 91 A.L.R. 1206; 31 Tex. Jur., p. 400, §13. Even so, whether the taking of a new debtor is intended to operate as a release of the liability of the old, in the absence of an express agreement to that effect, is usually a question of fact, and can only become a question of law when the state of the evidence is such that reasonable minds cannot differ as to its effect. Mc-

Elwrath v. City of McGregor, Tex. Civ. App., 58 S.W. 2d 851; Cooper Grocery Co. v. Strange, supra.

The question before us then is this: Does the evidence show a novation as a matter of law, or, on the other hand, is there evidence in the record that could reasonably form the basis of a conclusion that Whiteley-Phillips did not intend by entering into a written contract with Marshall to thereby release Chastain from his obligations under his oral contract?

From the record it appears that Whiteley-Phillips began drilling operations on September 22, 1948, under an oral contract with Chastain by the terms of which Whiteley-Phillips was to be paid at the rate of $6.00 per foot, plus extras. After the oral contract had been entered into, Chastain in a telephone conversation advised A.O. Phillips, President of Whiteley-Phillips, that he had made a deal with one Warren Wright to pay for drilling the well at the rate of $6.50 per foot and requested Phillips to prepare and enter into a contract with Wright on that basis, rebating fifty cents per foot to him, Chastain, and to confirm by letter. Accordingly, on September 21, 1948, Phillips prepared a contract and sent the same to Chastain for execution by Wright, and by letter confirmed the agreement for the rebate.

The record leaves no doubt that Chastain and Phillips intended that the contract with Wright should operate as a novation, Phillips himself testifying in that connection that he told Chastain that it "would be satisfactory to make the contract to Warren Wright" and that he "had an agreement to release Mr. Chastain." With contract conditions thus existing Whiteley-Phillips proceeded with drilling operations without a written contract with anyone.

The contract with Wright was never consummated and on October 28th Chastain wrote Whiteley-Phillips advising that Mr. Humphrey Marshall had decided to pay for drilling the well and advising: "Please write a new contract on same, leaving Mr. Warren Wright off and make for Mr. Marshall's signature." The letter further advised that Marshall would pay only $6.00 per foot, thereby rendering the rebate agreement ineffective, and that the contract should be handled through Marshall's attorney.

Following receipt of Chastain's letter Whiteley-Phillips pre-

pared a contract, dated back to September 20th, to be signed by both Chastain and Marshall, and Ellison Miles, an officer of Whiteley-Phillips, carried the contract to Shreveport for Chastain's signature. Chastain declined to sign the contract saying, according to the testimony of Miles, that he had made a deal with Marshall to pay the drilling costs, that "he wasn't responsible, he didn't have anything to do" with drilling the well, and that "he would appreciate it if we would make this contract with Marshall and he would guarantee the contract." Miles further testified that Chastain asked "on what terms we would accept Mr. Marshall," and that he answered that "the only way we would take over this contract would be that he (Marshall) would put up the money in the bank in Dallas in escrow."

Money to cover drilling costs was never deposited by Marshall but Whiteley-Phillips investigated Marshall's ability to pay such costs and, being assured on this score by Marshall's banker at Atlanta, proceeded to strike Chastain's name from the contract wherever it appeared and to execute the same with Marshall alone. There is no record evidence that from that time forward Whiteley - Phillips ever communicated with Chastain again with reference to payment of drilling costs until the filing of this suit, although one witness testified that first cost invoices were mailed to him and returned by him. In the meantime, however, Whiteley-Phillips sent invoices covering drilling costs to Marshall on November 15th and on November 30th "as covered by" and "in accordance with" our contract. Copies of the invoices did not go to Chastain. On March 31, 1949, Whiteley-Phillips filed its affidavit of record in the Mechanic Lien Records of Henderson County in which it was stated that "the annexed is a true and correct account of the labor performed and materials furnished by Whiteley-Phillips Drilling Company to Humphrey Marshall of Dallas County" and "that said labor was performed and materials were furnished to said Humphrey Marshall * * * under and by virtue of a written contract between Whiteley-Phillips Drilling Company and Humphrey Marshall * * *." There was no statement in the affidavit that any of the labor or materials were furnished to M. B. Chastain. Attached to the affidavit was the contract with Marshall and an itemized statement of the entire drilling costs all of which were shown to be in account with Marshall and none of which were shown to be in account with Chastain. All charges on Whiteley-Phillips' books were made to Marshall, none to Chastain.

As security for its debt Whiteley-Phillips took a mortgage

on two airplanes owned by Marshall, thereafter releasing one, and took from Marshall numerous assignments of oil and gas leases and interests in leases. It neither took nor sought any security from Chastain.

It cannot be doubted that the evidentiary excerpts here detailed offer on their face strong support for the conclusion reached by the Court of Civil Appeals. Viewing the evidence in its light most favorable to Whiteley-Phillips and disregarding that favorable to Chastain we nevertheless find that Whiteley-Phillips agreed to release Chastain in favor of a contract with Wright; that Chastain requested Whiteley-Phillips to substitute the name of Marshall for that of Wright; that Whiteley-Phillips at first declined to comply with this request, preparing the contract for both Chastain and Marshall to sign, but later complied by striking out Chastain's name when he refused to sign; that Whiteley-Phillips when asked on what terms they would accept Marshall on the contract agreed that it would "take over" the contract if Marshall would deposit the necessary funds in a Dallas bank, there being no occasion whatever for such a requirement if Marshall's signature to the contract was to be only additional security for the drilling costs; that Whiteley-Phillips made an independent investigation into Marshall's financial ability to pay the cost of drilling the well, there being again no reason for such an investigation if Marshall was to be but an additional debtor; that the contract on its face was in all respects an original contract, dated back to a date before drilling operations began, with no reference therein to an existing and continuing contract with Chastain; that all charges on Whiteley-Phillips' books were to Marshall, none to Chastain; that a mechanic's and materialman's lien was filed against Marshall, none against Chastain; that an effort was made before suit to collect from Marshall by obtaining mortgages, assignments, etc., but no such effort was made to collect from Chastain; that from the date of the signing of the contract with Marshall to the date of suit no further contact of any sort was had with Chastain with reference to the drilling of the well.

■ Whiteley-Phillips contends that its position that there was no intention to release Chastain and therefore no novation finds support in the following circumstances: (1) The testimony of its official that they did not intend that the contract with Marshall should operate as a release of Chastain. But their testimony as to their mental state is overcome by their acts and conduct clearly showing the contrary. (2) The denial by Chastain of the existence of the oral contract, it being contended in

this connection that Chastain could not have intended that the contract with Marshall should operate to release his obligations under the oral contract since he never recognized the existence of the oral contract. This is but another instance of alternative positions which one is permitted to take in a civil suit, and the claim by Chastain that the oral contract never existed, and a finding by the trial court that it did, did not prevent him from asserting and prevailing on the further claim in the alternative that if the oral contract did exist he was released by the novation thereof. (3) The statement of Chastain that if Whiteley-Phillips would make the contract with Marshall he "would guarantee the contract." As we view this statement it supports the position of a novation rather than the position of no novation in that it indicates an offer by Chastain to substitute an oral contract of guaranty of Marshall's liability in lieu of his own contract of primary liability and an acceptance of such offer by Whiteley-Phillips. (4) Testimony of Whiteley-Phillips' officials that the account was set up on their books in the name of Marshall because Chastain requested when the written contract was presented to him for his signature that all charges be made to Marshall. This testimony tends to support the view that Chastain was insisting on the substitution of Marshall's obligation for his own and does not support Whiteley-Phillips' position of no novation. (5) Testimony of Chastain that at the time the written contract was presented to him nothing was said about releasing him by any of the parties. The absence of such a statement can be of little comfort to Whiteley-Phillips. It indicates, at most, that there was no express release. If there had been, there would be no occasion for resting the result reached herein on circumstantial evidence. (6) Testimony of Miles and of Bill Campbell, attorney for Marshall, that at the time Marshall and Miles executed the written contract, Miles then stated, in substance, that by entering into the written contract Whiteley-Phillips did not intend to release Chastain. While it is held generally that hearsay and self-serving declarations of this character accompanying an act are admissible against or on behalf of the declarant to explain the act and to show the intent of the declarant, the rule appears to be applied only in cases where the declaration is consistent with and explanatory of the act. We doubt that declarations of intention accompanying an act but wholly inconsistent therewith should be admitted to prove intent. This court said in Ex-Parte Blumer, 27 Texas 734,744, that such declarations "are to be credited as the index of his intention, when not unreasonable in themselves, *not inconsistent with other facts in the case*, and not under circum-

stances creating suspicion of insincerity." At the very time the declaration indicating an absence of intention to release Chastain was being made Miles was striking Chastain's name from the written contract, dated back to the beginning of operations, and signing the contract with Marshall alone, an act wholly inconsistent with the declaration. In any event, the declaration alleged to have been made by Miles at the time he signed the contract is entitled to no more weight than his testimony as a witness that he did not intend that his act should operate as a release of Chastain. Such declarations of intent were nullified by the acts and conduct of the parties clearly establishing a contrary intent.

■ From our examination and analysis of the record we must hold that there is in the record no evidence of probative force to support the finding of the trial court that Whiteley-Phillips did not intend by its written contract with Marshall to release Chastain from the obligations of his oral contract. On the contrary, the evidence that it did so intend is so conclusive that we hardly see how reasonable minds could differ with respect thereto.

The application of Chastain presents these questions: That there is in the record no evidence of probative force to support the trial court's judgment against him in favor of National Supply Company for the sum of $2,176.13 as the value of certain oil well equipment, and no evidence to support the judgment against him in favor of Cooper and Reed for the sum of $1,310.00 for services rendered in building roads, digging pits and preparing the location for the drilling of the well; and that the court was without authority to render judgment against him for attorneys' fees in favor of National Supply Company in the sum of $350.00 and in favor of Cooper and Reed in the sum of $250.00. Chastain's specific contention is that the equipment and services were contracted for by one Mitcham who, although an agent of Chastain in the Tri-Cities field in Henderson County in the operation of certain producing leases since 1946, was not the agent of Chastain but the agent of Humphrey Marshall in his activities in connection with the drilling of this particular well.

The claim of National Supply Company rests upon the apparent authority of Mitcham to bind Chastain for the purchase of oil well drilling equipment known as a "Christmas tree" at a cost of $2,048.15 and 450 feet of pipe at a cost of $127.98.

■ The doctrine of apparent authority is based on estoppel, and one seeking to charge a principal through the apparent authority of an agent to bind the principal must prove such conduct on the part of the principal as would lead a reasonably prudent person, using diligence and discretion, to suppose that the agent has the authority he purports to exercise. Great American Casualty Co. v. Eichelberger, Tex. Civ. App., 37 S.W. 2d 1050, writ refused. In this case National Supply Company rests its case upon the conduct of Chastain in permitting Mitcham to make purchases in his behalf from such company on prior occasions. The only testimony in the record with regard to such prior purchases comes from Chastain himself, as follows:

"Q. Mr. Mitcham has purchased materials from the National Supply Company for you?
"A. Nothing only small makeup supplies on the lease.
"Q. He has from time to time made purchases from the National Supply Company?
"A. Not any big purchases, he might have bought a few small items.
"Q. He has made purchases though?
"A. I don't know, you will have to ask him, I just don't know."

National Supply Company offered as witnesses on the trial of the case one N. S. Shipman who had been the company's salesman in the Tri-Cities field since 1945, and W. P. Smith, Division Credit Manager of the company in charge of credits in the area where the Tri-Cities field was located, but there is in the record not one word of testimony from either of such witnesses as to prior sales made to Chastain through Mitcham. There is no testimony from anyone representing National Supply Company that the company was induced to sell the items in controversy here on Mitcham's order because Chastain had permitted Mitcham in the past to make purchases on his behalf from the company. As a matter of fact, the record reflects that the Christmas tree was shipped to the well by Cameron Iron Works from whom it was ordered via telephone by Mitcham, and that it had already been delivered on the job before the agent of National Supply Company—through whom it was billed because Cameron sold only through its representative outlets—sought the signing of a formal order blank. Even then National Supply Company's representative at first obtained the signature of one of Whiteley-Phillips' drillers to the order blank, and obtained Mitcham's signature thereto only after the driller, on reflection, had his signature removed because of the large amount

involved. Thus at appears that the sale of the Christmas tree was actually made by Cameron Iron Works, and there is no evidence that anyone connected with National Supply Company knew that the order was placed by Mitcham or that National Supply Company accepted responsibility for the credit sale because of a belief that Mitcham was authorized to make the purchase on behalf of Chastain. Neither the testimony of the witnesses for National Supply Company nor the very indefinite and uncertain testimony of Chastain himself will support a recovery against Chastain based on a prior course of dealing with Mitcham as Chastain's agent. Neither does the evidence in the record establish the other necessary elements of estoppel. 2 Tex. Jur., Agency, p. 425, §39 - p. 431, §43; 2 Am. Jur., Agency, pp. 86-90, §§104,105; 2 C.J.S., Agency, §29b (2) (b), pp. 1063-1067, §96, pp. 1205-1220. Since no part of the National Supply Company judgment on its claim can be permitted to stand, neither can its judgment for attorneys' fees. Article 2226, Vernon's Annotated Statutes.

■ With respect to the claim of Cooper and Reed, the evidence viewed in its most favorable light in support of the judgment, reflects that Cooper and Reed, who were in the bulldozer business, had been employed by Mitcham on prior occasions to do dirt work for Chastain in the Tri-Cities field on the Riddlesperger and Baker leases, and that invoices on such work were made out to Chastain and paid by Chastain; that Mitcham represented that the claimants were being employed to do the work in question for Chastain; that the first invoice was made out to and forwarded to Chastain for payment but was returned by Chastain's office manager to Mitcham on September 27, 1948, with a letter stating: "Please have them bill the $260.00 to Mr. Warren Wright, c/o M. B. Chastain, 725 Giddens Lane Bldg., Shreveport, La., as this is his bill, and we do not want to run the same through our books. Mr. Chastain will see that the bill is paid"; that claimant's first and second invoices were then billed to Warren Wright but they were returned unpaid; that at about the time claimant completed their work Mitcham asked them to bill all of their invoices to Humphrey Marshall which they did but the bills remained unpaid.

If the foregoing evidence is not such as to support the trial court's finding that Mitcham had express authority to represent Chastain in engaging the services of Cooper and Reed, which it is unnecessary to decide, it will at the very least support the trial court's finding that Mitcham had apparent authority to engage such services on behalf of Chastain.

Cooper and Reed's claim for services arose and their cause of action therefor accrued prior to the effective date of the Amendment to Article 2226, Vernon's Annotated Statutes, whereby the amount of attorneys' fees recoverable in cases of this type was changed from an amount "not to exceed twenty dollars" to "a reasonable amount." The amendment of the statute was not retroactive. Government Personnel Mutual Life Ins. Co. v. Wear, 151 Texas 454, 251 S.W. 2d 525. The trial court was without authority to allow Cooper and Reed a recovery of attorney's fees in excess of $20.00.

The judgments of the courts below in favor of National Supply Company against M. B. Chastain are reversed and judgment is here rendered that as against M. B. Chastain National Supply Company take nothing. The judgments of the courts below in favor of Cooper and Reed against M. B. Chastain are reformed so as to allow Cooper and Reed a total recovery against M. B. Chastain of $1,330.00. The judgment of the Court of Civil Appeals in all other respects is affirmed. All costs on appeal are assessed against Whiteley-Phillips Drilling Company and National Supply Company equally.

Opinion delivered April 1, 1953.

Associate Justice Culver not sitting.

MR. JUSTICE SMITH, joined by Justices Griffin and Wilson, dissenting.

I respectfully file this dissent to that portion of the majority opinion relative to the controversy between Mr. Chastain and the Whiteley-Phillips Drilling Company. Mr. Chastain made the contention that he had not entered into an oral contract with Whiteley-Phillips, but that in the event the court should find that such an oral agreement existed, then there was a novation thereof when Whiteley-Phillips executed the written contract with Mr. Humphrey Marshall. The burden of proof rested with Mr. Chastain to prove that Whiteley-Phillips accepted Mr. Marshall as a new debtor with the intent to release Mr. Chastain. While it is true that assent to, and acceptance of, the terms of novation ordinarily need not be shown by express words to that effect, but the same may be implied from the facts and circumstances attending the transaction and the conduct of the parties thereafter; nevertheless, the facts and circumstances must be such that the intention to work a novation may be clearly implied. 66 C. J. S., Novation Sec. 4a, p. 684. The

trial court found as a fact that Mr. Chastain failed to discharge his burden, and, therefore, held that he was liable under the oral contract for all obligations which accrued up until October 28, 1948. The Court of Civil Appeals held, as a matter of law, that there was a novation and the majority opinion has affirmed such holding. In so holding, the majority has shifted the burden of proof. The question for us to determine is this: Has Mr. Chastain discharged his burden through competent evidence showing that it was the intention of Whiteley-Phillips to release him and accept Mr. Marshall's contract in lieu of the original debtor, Mr. Chastain? To uphold the holding of the Court of Civil Appeals in this case we would necessarily be compelled to hold that, as a matter of law, there was no evidence of probative force supporting the findings of fact and judgment of the trial court that Mr. Chastain had failed to discharge his burden of proving a novation. At this point, I wish to set out out a summary of testimony of the witnesses, M. B. Chastain, respondent; Vernon Whiteley, an officer of Whiteley-Phillips; Ellison Miles, also an officer of Whiteley-Phillips; A. O. Phillips, and officer of Whiteley-Phillips; W. E. Rembert, office manager for Mr. Chastain, and Bill Campbell, attorney for Mr. Marshall. This testimony is on the question of novation.

Mr. M. B. Chastain testified:

"On November 9, 1948, Ellison Miles presented the contract calling for my signature and that of Marshall. I had never agreed to be responsible for anything. All I had was an override. * * * I imagine they knew it. I told Mr. Miles I had nothing to do with drilling the well, that was Marshall's well it wasn't mine. I had just come back from a hunting trip and met Miles with Rembert in front of the building, I didn't get out of the car. Miles asked me to sign. I told him it wasn't my well, I didn't feel that I should sign it, that was about all that was said. I wasn't on any contract and there wasn't anything said about me being released if Marshall signed. I didn't feel I had an obligation. * * * Warren Wright was going to drill the well for Marshall and was to get an interest in the well. Marshall told me this. I told Marshall I would like to have 50c a foot to cover my expenses. I haven't received anything for any of my work. The first time that I knew Whiteley-Phillips was contending I was mixed up in the contract was November 9, when Miles came to Shreveport and asked me to sign the contract. I told Miles all I had was a working interest in the well, free and clear in the well. I told him 'I don't believe it is my place to sign it'. The next morning Mr. Miles called me and asked me if there

was any use to come back. I told him no, it wasn't my well. He didn't come back to my office. As well as I remember it has been two years ago. It was about October 26-27 when I learned that Warren Wright's deal with Humphrey Marshall had broken down, I called Mr. Rembert and told him to advise Mr. Whiteley. I never said anything to Mr. Miles about guaranteeing Chastain."

Vernon Whiteley testified as follows:

"The first time I heard about Warren Wright was from Chastain after Chastain had already ordered me to move on to the location. Chastain said he wanted to change the contract and make it out for Warren Wright at $6.50 per foot to him and give Chastain a letter agreeing to give the other 50c back to Chastain after the completion of the job. Nothing was said in this conversation with reference to releasing Chastain. I had nothing to do with drawing the contract. This was done by the main office. * * * Several days later Chastain called me again and said he would like to change the contract to Marshall. (Referring to the letter dated October 28). This was the time of the telephone conversation. Nothing was said in this conversation as to whether we were going to release Chastain. I have never told anyone we were going to release him. Prior to October 28, I had never heard anything about Marshall agreeing to pay the contract. This was the first time. * * * Chastain told me 'I would like for you to make the contract to Mr. Marshall'. I didn't call the Atlanta bank about Marshall but I think Mr. Miles did. I cannot say exactly the date when Mr. Rembert called me. I didn't have anything to do with making the written contract with Marshall. Chastain asked me to send the invoice to Marshall. It was first sent to Mr. Chastain. (Referring to a letter and invoice dated November 15, 1948, addressed to Humphrey Marshall for certain charges). As well as I remember we sent a letter like that to Chastain. (Referring to a letter and invoice dated November 30, 1948, to Marshall for certain charges). I don't think we sent an invoice like that to Chastain."

Ellison Miles testified:

"On November 8, 1948, I went to Shreveport and met Chastain in front of his building as he came up in his car. He had notified us that he wanted a contract written up for Humphrey

Marshall and he told me that he had made the deal with Marshall to pay him for the well. I told him I didn't know anything about Marshall. We had agreed to drill the well for him, not Marshall. He said he would appreciate it if we would make this contract with Marshall since he had made this deal and he would guarantee the contract. He would see that Mr. Marshall was financially able to pay for the drilling of the well. He asked me on what terms we would accept Marshall and I told him the only way we would take over this contract would be to have the money in the bank in escrow. He said that he would see to it that Marshall put up the money in the bank to cover the drilling costs but this was never done. He told me that if I would go on back to Dallas he would get hold of Mr. Marshall and arrange for the money to be put in the bank and would contact me with regard to it. I didn't hear any more from him and was unable to get him on the phone. He was a hard man to get on the phone. We continued drilling the well and since I was unable to ever contact Mr. Chastain again I got in touch with Bill Campbell, representing Marshall, about signing the contract. Campbell arranged for us to meet in our office to sign. At the time the contract was signed nothing was said about releasing Chastain. The accounts in our office were set up in the name of Humphrey Marshall because Chastain requested it. The request I refer to is my meeting Chastain on November 9, at Shreveport and in the letter of October 28, from Chastain. * * * Chastain told me on November 9, to make the contract with Marshall to cover the entire cost of drilling the well. He told me that he wasn't responsible, that he had made a deal with Marshall. * * * I would say all the records on this well are charged to M. B. Chastain. The accounts attached to the lien are charged to Marshall at the request of Chastain. The lien does not show anything about Chastain. About Chastain owing the money, these accounts were originally mailed to Chastain and he returned them to our office and said we had billed him in error. I cannot produce a copy of any letter where we sent copies of the invoices to him. We added Chastain's name on the bills when we brought the suit. I made an investigation of Mr. Marshall's finances by calling the bank at Atlanta. The banker told me he thought Marshall was financially able to handle the contract. I asked him to send me a financial statement on Marshall and he said he would but several days later said he was unable to furnish it. * * * The contract with Marshall was signed in our office in the presence of myself, Marshall and Bill Campbell. There is a notation at the top of the contract "All strikeouts of the name of M. B. Chastain are approved." At the time this notation was made I

said to Mr. Marshall that we were taking this contract from him at the request of Mr. Chastain but we did not in taking this contract relieve Mr. Chastain of his responsibility in carrying out his contract that he made with us on November 9. It was in September. Mr. Chastain refused to sign the contract but he did look at it."

A. O. Phillips testified:

"The only time I ever talked to Chastain was on the telephone about the Warren Wright deal. He said he had made a deal with Warren Wright to drill the well and would it be satisfactory for us to make the contract with Warren Wright. At this time drilling operations had already been commenced. He said that he had made this deal with Warren Wright for 50c a foot more than he had with us and asked me if it would be all right to cut the 50c back to him. I told him it would. After the conversation I had my office man draw the contract with Warren Wright and sent it to Mr. Chastain with a letter dated September 21. * * * I never heard any more about the Warren Wright contract and don't know why Chastain didn't get it signed. Concerning whether we would release Chastain my conversation with him was that 'it would be satisfactory to take Warren Wright on the contract'. I told him it would be satisfactory to make the contract to Warren Wright. That is my best recollection of what we said."

Mr. Rembert testified as follows:

"In September Whiteley and Miles came to Shreveport to talk about getting the contract to drill the well. Chastain told them that he had gotten the lease, had farmed it out to Marshall and that Marshall was making a deal with Warren Wright; that he believed he could get the contract for Whiteley-Phillips, but he wanted 50c a foot as a commission. On October 27 I talked with Whiteley on the phone saying that Chastain had called me and asked me to call Whiteley, that Marshall had decided to drill the well himself and to fix the contract for his signature. Whiteley said that would be all right and to confirm the conversation with a letter to Dallas. * * * November 9, Miles came to Shreveport to Chastain's office with a contract for Chastain to sign. I told him I didn't believe he would sign it. We met Chastain in front of the building when he arrived and Miles asked him to sign the contract. Chastain told him it was not his contract, it was Marshall's and he would not sign it. Chastain did not look at the contract. Chastain did not say he would guarantee

Marshall's contract. Up to October 27, neither Chastain nor myself ever put anyone from Whiteley-Phillips in contact with Humphrey Marshall. * * * On November 9, when Miles asked Chastain to sign the contract and he refused, nothing was said about releasing Chastain. * * * Nor was anything at all said about a previous contract having been made with Chastain."

Bill Campbell testified:

"I was present when Marshall and Miles (for Whiteley-Phillips) signed the drilling contract. It was in Ardis Phillips' office in Dallas. I remember the notation at the top of the contract that strikeouts were approved. Miles made the statement that they were striking this name (Chastain) out. I could have done the striking out myself, I don't know, I don't think I did. Miles said 'we are still looking to Humphrey Marshall on this' * * * I mean 'we are still looking to Mr. Chastain on this' at that time. * * * I am not going to say I didn't make the strikeouts on there, I do know that Chastain's name was stricken from the instrument. Humphrey Marshall had been on a trade with Warren Wright in early September, 1948. The abstract was delivered to my office with instructions to give them to Warren Wright's attorney. * * * I am pretty positive I made a statement to them (Miles and Marshall at the time the contract was signed) about the possibility that all these strikeouts might be considered by some party as an alteration. I am sure that this notation at the top grew out of some suggestions of mine although it is not written in the language I would write it. I am sure that I suggested to Miles and Marshall that some notation ought to be made about the strikeouts, I am positive of that, it would be a natural attorney's comment."

The defense of novation is based on circumstantial evidence that Whiteley-Phillips impliedly intended to release Mr. Chastain. But, in my opinion, it only raises an inference, and does not meet the requirement that the intention to work a novation must be clearly implied. At most, the evidence presented an issue of fact, which the trier of the facts has determined against Mr. Chastain. Not only is it necessary to prove the creditor took a new debtor, but it must also be made to appear, in order to release the old debtor, that there was an agreement to look to the new debtor alone. The mere taking of a new debtor for the old debt would not, standing alone, be sufficient to show novation. Scott v. Atchison. 36 Texas 76, Id. 38 Texas 385; M. Gimble & Sons v. King, 43 Texas Civ. App. 188, 95 S.W. 7; Rushing v. Citizens National Bank, 162 S.W. 460, writ refused; Pierce-

Fordyce Oil Ass'n. v. Woods, Tex. Civ. App., 180 S.W. 1181, 1183, writ refused. At this juncture it might be well to analyze the testimony and see if it isn't fair to say that reasonable minds can differ as to the effect of the evidence. Mr. Chastain admits that Whiteley-Phillips never, at any time, mentioned the matter of releasing him from his obligation under the contract. But he claims that the fact that Whiteley-Phillips was willing to accept Mr. Warren Wright is evidence that it intended to release Chastain when it entered into the contract with Mr. Marshall. The trial court said it was not. Mr. Wright entered into the picture at the instance of Mr. Chastain some time after the oral agreement and at a time when Whiteley-Phillips only knew of Mr. Chastain in the transaction. Whiteley-Phillips was willing to accept Mr. Wright because it knew that Mr. Wright was financially able to carry out the contract. Then, after Mr. Wright failed to enter into the contract, Mr. Chastain suggested Mr. Marshall. This was about October 28, 1948, and the witnesses testified that they had never heard of Mr. Marshall until this suggestion was made by Mr. Chastain. The trial court, no doubt, could understand why it was to the interest of Mr. Chastain to include Mr. Marshall as an additional debtor. Mr. Chastain had obtained a lease from the Murchisons, which contained a drilling clause that lessee was to begin operations within thirty days. On August 19, 1948, Mr. Chastain assigned this lease to Mr. Marshall, but the assignment was not placed of record until September 22, 1948, which was after Mr. Chastain entered into the oral agreement with Whiteley-Phillips to drill the well. All negotiations were with Mr. Chastain until October 27, 1948 or October 28, 1948. Certainly, Mr. Chastain would have been in a much stronger position with Mr. Marshall. Under the evidence, Mr. Chastain, by virtue of his oral contract; was bound to meet his obligations, and it was not necessary for him to guarantee Mr. Marshall's contract. Mr. Chastain made the offer to guarantee the Marshall contract on the theory that he had never entered into the contract, but the trial court found against him on that theory, and he now stands before this Court under full and complete obligation to comply with the terms of the contract unless he has clearly proved a novation. His letter dated October 28, 1948, states that "Mr. Humphrey Marshall has decided to pay for the cost of drilling the Murchison No. 1 well * * *". Now, isn't it reasonable to conclude, as the trial court did, that no sane man would give up a certainty for an uncertainty? The testimony of Ellison Miles indicates clearly that he had no such intention when he testified as follows: "At that time he said—in the meantime he had notified us that he

wanted this contract written up in the name of Humphrey Marshall. When I met him on November the 9th, I told him I had this contract, I wanted him to sign, he said, 'I have made a deal with Humphrey Marshall to drill this well, and for him to pay for it'. *I told him we didn't know anything about him. We had agreed to drill this well for him and not Mr. Marshall.* He said he would appreciate it if we would make this contract with Mr. Marshall since he had made this deal, and he would guarantee the contract."

The trier of the facts is the judge of the credibility of the witnesses and the weight to be given their testimony. No doubt, the trial court considered the underlined testimony above to mean that Mr. Miles told Mr. Chastain that "we had agreed to drill the well with him and not Mr. Marshall." Of course, if one wants to view the matter from a technical standpoint and say that the first italicized sentence has no relation to the italicized sentence immediately following you could say that Mr. Miles didn't tell Mr. Chastain that he had agreed to drill the well for him and not Mr. Marshall. But, in view of the trial court's findings and judgment, we must say that the court con-concluded from this and other evidence that Whiteley-Phillips was still looking to Mr. Chastain to pay his obligations under the oral contract.

The respondent, Mr. Chastain, further contends that the fact that his name was stricken from the contract is conclusive evidence of a novation. He contends that this is true for the reason that the notation at the top of the contract "all strikeouts of the name of M. B. Chastain are approved." Now, are we going to follow this contention, or follow the evidence, which definitely and clearly explained this notation? Mr. Campbell testified "I am pretty positive I made a statement to them (Miles and Marshall at the time the contract was signed) about the possibility that all these strikeouts might be considered by some party as an alteration".

The majority refers to certain evidentiary excerpts and says they offer, on their face, strong support for the conclusion reached by the Court of Civil Appeals. What the Court of Civil Appeals concludes in regard to the facts is not the test. The trial court had the sole right to weigh the evidence. It had the right to say, and reasonably so, that from all the facts and circumstances in this case, the taking of additional security from Mr. Marshall did not show a novation as a matter of law. The

taking of collateral security or promise from a debtor or a stranger does not effect a novation, inasmuch as one may accept money or performance of a contract from a third party without releasing the original obligor. The fact that the new party is also liable, whether jointly or collaterally, to the creditor does not operate as a novation, since the mere addition of a party is not a substitution. See 66 C. J. S. Novation Section 2, 682; McCartney v. Kipp, 171 Pa. 644, 33 Atl. 233. This Court should never set aside findings of fact by the trial court merely because the court could have drawn different inferences or conclusions. The trial court has considered all the facts admitted in evidence, and has selected that which it considered most reasonable. Burlington-Rock Island Ry. Co. v. Ellison, 140 Texas 353, 167 S.W. 2d 723; Lockley v. Page, 142 Texas 594, 180 S.W. 2d 616.

Reverting now to the contention of respondent, Mr. Chastain, with reference to the effect of the notation "all strikeouts of the name of M. B. Chastain approved", Mr. Campbell testified that this notation was put at the top of the instrument to avoid the possibility that some party would think the contract had been altered. He also testified that at the time this notation was being made, he heard Mr. Miles tell Mr. Marshall that "we are still looking to Mr. Chastain on this." At the time this last quoted testimony was offered, the respondent, Mr. Chastain, objected to the introduction thereof "for the reason that it was not made in the presence of M. B. Chastain and would not be binding on him in any manner". The objection was overruled, and thereupon, Mr. Winn, an attorney for Mason Bland, further objected to the question and answer and asked that the answer be stricken "because any statement made by Ellison Miles would be a self-serving declaration * * *". This objection was overruled. I think there was sufficient evidence in the record, aside from this testimony, to support the findings of the trial court. However, in my opinion, this testimony was admissible on the vital issue of the intention of Mr. Miles at the time the name of Mr. Chastain was stricken from the contract and the notation made. When question of intent is an issue, declarations may be relevant evidence, and when acts are admitted in evidence, declarations accompanying such acts and explanatory of them are always admissible. Southland Life Ins. Co. v. Greenwade, Tex. Civ. App., 143 S.W. 2d 648, writ granted; affirmed, 138 Texas 450, 159 S.W. 2d 854; O'Fiel v. Janes, Tex. Civ. App., 269 S.W. 1074; affirmed, Texas Com. App., 280 S.W. 163; Prater v. Traders & General Ins. Co., Tex. Civ. App., 83 S.W. 2d 1038; Whitlow v. Durst, 20 Cal. 2d 523, 127 Pac. 2d 530; Ayoob v. Ayoob,

74 Cal. App. 2d 236, 168 Pac. 2d 462; Commonwealth v. Trefethen, 157 Mass. 180, 31 N.E. 961, 24 L.R.A. 235; Mutual Life Ins. Co. v. Hillman, 145 U.S. 285, 12 Sup. Ct. 909, 36 L. Ed. 706; 31 C. J. S. Evidence Section 256, 1007, 1008.

In this case, Whiteley-Phillips has made the contention throughout that it never, at any time, had any intention of releasing Mr. Chastain. Ellison Miles had so told Mr. Chastain just prior to meeting with Mr. Marshall and his attorney, Mr. Campbell. The evidence that he made the same statement to Mr. Marshall was admissible. As stated by the court in the case of Mutual Life Ins. Co. v. Hillman, supra: "The existence of a particular intention in a certain person at a certain time being a material fact to be proved, evidence that he expressed that intention at that time is as direct evidence of the fact as his own testimony that he then had that intenion would be." In this same case, the court, in discussing the admissibility of letters written by a party expressing his inteniton to make a journey, said: "A man's state of mind or feeling can only be manifested to others by countenance, attitude, or gesture, or by sounds or words, spoken or written. The nature of the fact to be proved is the same, and the evidence of its proper tokens is equally competent to prove it, whether expressed by aspect or conduct, by voice or pen. When intention to be proved is important only as qualifying an act, its connection with that act must be shown, in order to warrant the admission of declarations of the intention. But whenever the intention is of itself a distinct and material fact in a chain of circumstances it may be proved by contemporaneous oral or written declarations of the party." This case, as well as the case of Commonwealth v. Trefethen, supra, was quoted with approval in the case of Traders & General Ins. Co., supra, and this last mentioned case was cited as authority for the holding in the case of Southland Life Ins. Co. v. Greenwade, supra.

For the reasons stated, the judgment of the Court of Civil Appeals that Whiteley-Phillips Drilling Company take nothing as against M. B. Chastain should be reversed, and the judgment of the trial court affirmed.

I agree with the opinion of the majority as to the claims of respondents, Cooper and Reed and National Supply Company against the petitioner, M. B. Chastain.

Associate Justices Griffin and Wilson join in this dissent.

Opinion delivered April 1, 1953.