Jim MORRIS, Appellant,

v.

J. I. CASE CREDIT CORPORATION et al., Appellees.

No. 14541.

Court of Civil Appeals of Texas.

San Antonio.

Jan. 18, 1967.

Rehearing Denied Feb. 23, 1967.

Waitz, Bretz & Collins, San Antonio, for appellant.

Trueheart, McMillan, Russell & Hoffman, San Antonio, for appellees.

BARROW, Chief Justice.

Appellee J. I. Case Credit Corporation, alter ego of appellee J. I. Case Company, filed this suit to recover balances due it by its former franchised dealer, appellant, Jim Morris, d/b/a Industrial Machinery Company, under several written instruments of indebtedness and on an open account. Judgment was rendered non obstante veredicto, whereby appellee Case Credit recovered the sum of $103,836.57, together with interest, and attorneys' fees in the sum of $729.97. The sum of $29,429.87 in possession of the District Clerk as the result of a judicial sale, under trust receipts given Case Credit by Morris, was ordered deliver-

ed to Case Credit to be applied on this judgment.

Appellant, Morris, asserts by five points of error that under the undisputed evidence, as well as by the findings of the jury, the dealership contracts between Morris and the Case Company, together with the course of conduct between the parties, enabled Morris to obtain the exclusive right to sell Case machinery in Bexar and other counties in violation of the Texas Anti-Trust Laws,[1] and hence all transactions were illegal, void and unenforceable.

■ A similar contention was asserted in Climatic Air Distributors of South Texas v. Climatic Air Sales, Inc., 162 Tex. 237, 345 S.W.2d 702 (1962), wherein the Supreme Court held that the granting and accepting of the exclusive right to sell a manufacturer's product within a given territory is made a violation of the anti-trust laws and is void and unenforceable. The Court upheld a summary judgment denying the manufacturer recovery for the price of air-conditioning units sold to its distributor under such a contract. See also Patrizi v. McAninch, 153 Tex. 389, 269 S.W.2d 343 (1954); Ford Motor Co. v. State, 142 Tex. 5, 175 S.W.2d 230 (1943); Jackson Brewing Co. v. Clarke, Tex.Civ.App., 375 S.W.2d 352, writ ref'd n. r. e.; Grand Prize Dist. Co. of San Antonio v. Gulf Brewing Co., Tex.Civ.App., 267 S.W.2d 906, writ ref'd; 13 Baylor Law Review 295.

The Case Company (all references herein are to the parent corporation unless the Case Credit Corporation is specifically designated) is incorporated under the laws of Wisconsin for the purpose of manufacturing and selling machinery. Although it had manufacturing plants in several states, its home and general office was in Racine, Wisconsin. This case relates solely to the Company's sales activities which were carried on through a vast and highly organized structure.

Case sold two types of equipment—agricultural and industrial—and each type had its own sales and service organization under a general manager. These two general sales managers were under Mr. Reid, Vice-President for Marketing, and he therefore had control over both organizations. Under Mr. Cody, who was general sales manager industrial, were several administrative and departmental assistants and three regional managers. Mr. McMaster was manager of Midwest Division, Industrial, which area included Texas, and as such directed the activities of the Case Company Industrial field organization in line with company policies, programs and sales objectives. Mr. Hodgson was one of eighteen District Managers Industrial in the United States, and his territory included all of south and southwest Texas. Among other duties, he was responsible for securing, establishing and developing a proper dealer organization to obtain a representative share of market potential. He was also responsible for proper reporting of field activities and programs on forms and other documents as required.

On March 23, 1961, Morris became a franchised dealer for Case. At this time Case dealer contracts were in four classifications, and Morris executed a heavy construction dealer industrial contract and a light construction dealer industrial contract with Case. Effective November 1, 1961, Case changed the form of its dealer contracts to reclassify its equipment into three classifications: agricultural, industrial and utility. Under this new classification, both the industrial and agricultural divisions could appoint utility dealers; and all dealers signed new contracts. On December 28, 1961, Morris signed two new contracts appointing him an industrial and utility dealer.

All accounts sued on by Case Credit Corporation relate to transactions occurring after December 28, 1961. Case urges that the rights of the parties must be governed solely by the terms of the December, 1961,

1. Arts. 7426, 7428, 7437, Vernon's Ann.Civ.St.

contracts, which were never modified in writing, as required by their terms. The new industrial and utility contracts are somewhat similar, and the terms of each are contained in booklets consisting of twelve printed pages plus four cover pages. One significant difference between the two contracts is Paragraph 13 in each. In the industrial contract the dealer covenants that he will employ adequate and competent sales and service personnel to enable him to attain the sales potential and uphold the good will and reputation of the Company "in the territory assigned to him as follows: See attached." A letter from Morris, agreeing to work twenty designated counties and the counties enclosed thereby, is attached to the contract. In the utility contract the dealer covenanted to perform these acts "in Dealer's trade area" and there is no list of counties attached to the contract. Morris does not contend that the December, 1961, contracts, by express terms, violate the Texas anti-trust statutes, but that these contracts are part of a course of conduct which enabled him to obtain exclusive territory.

■ In Ford Motor Co. v. State, supra, the Supreme Court held that any intentional course of conduct by the parties to a contract which accomplishes the result prohibited by our anti-trust laws, violates the same just as effectively as if it had accomplished such result by direct contract. Nor is this result avoided by a clause in each contract that any provision prohibited by the laws applicable in any state shall be ineffective to the extent of such prohibition. Patrizi v. McAninch, supra. We must, fore, examine this record to determine if there are findings, properly supported by pleadings and evidence, to establish that the parties entered into an intentional course of conduct to give Morris the exclusive right to sell Case products within a given territory in violation of the Texas anti-trust laws.

The jury found that Hodgson and Morris pursued an intentional course of conduct which enabled Morris to obtain exclusive right to sell the Case Company line of industrial machines in Bexar County and certain other designated counties, and to sell its line of utility machines in Bexar County. It was further found that Hodgson had apparent authority to act for Case when he pursued this course of conduct. Similar findings were made as to McMaster. The jury found, however, Reid, Vice-President of Case, did not have knowledge of the intentional course of conduct of either Hodgson or McMaster, and did not answer the issue, conditionally submitted, as to whether Reid acquiesced in said course of conduct.

■ In Chastain v. Cooper & Reed, 152 Tex. 322, 257 S.W.2d 422, 427 (1953), the Supreme Court said: "The doctrine of apparent authority is based on estoppel, and one seeking to charge a principal through the apparent authority of an agent to bind the principal must prove such conduct on the part of the principal as would lead a reasonably prudent person, using diligence and discretion, to suppose that the agent has the authority he purports to exercise." See also Pioneer Casualty Company v. Blackwell, 383 S.W.2d 216, 219, writ ref'd n. r. e.; Almar-York Co. v. Fort Worth National Bank, 374 S.W.2d 940, 943, writ ref'd n. r e. It is seen that the definition of "apparent authority" as submitted to the jury herein,[2] substantially set forth the requisites which the Supreme Court found necessary in the Chastain case to charge a principal.

■ Case asserts at the outset the procedural complaint, properly preserved by its objection to the court's charge, that there are no pleadings to support the submission of the issues relative to "apparent authority." Nowhere in Morris' pleading does he allege that Case is "estopped." He does allege that the contracts were from time to

2. "By the term 'apparent authority,' as used in this charge, means such authority as a reasonably prudent person, using diligence and discretion, in view of the con-

duct of the J. I. Case Company, would naturally and reasonably suppose its employee to have."

time changed and varied by and through the duly authorized representatives of Case and Case Credit, acting within the scope of their apparent authority. Morris further alleged in detail the acts of the agents of Case which constituted the "intentional course of conduct" to give him an exclusive sales territory. In the absence of a special exception these allegations were sufficient to support the submission of issues of apparent authority.

The lengthy record in this case establishes that McMaster, Hodgson and Morris, primarily at the insistence of Morris, secured for Morris an exclusive distributorship for the industrial line throughout the San Antonio trade area defined by the counties listed by Morris, and that Morris became the only authorized dealer of the utility line for Bexar County. The evidence differs as to each line, and therefore each must be discussed separately.

■ Case urges that the terms of the March, 1961, contract were inadmissible and without probative force since all accounts sued on herein were incurred subsequent to execution of the December, 1961, contracts. These new contracts were executed for the purpose of reclassifying the equipment and not to change contractual terms then in existence. In response to a request for admission Case stated that it was necessary to change and revise its contracts to reclassify the groups of equipment into three categories. There is no provision in the new contracts requiring a change in relationship of the parties from that existing, and there is no evidence that there was at that time any change in their manner of operation. The trial court properly permitted the jury to consider the terms of the March, 1961, contracts.

The March, 1961, contracts expressly gave Morris a specific territory. Each provided that the designated equipment was "to be sold for industrial use only and for the territory of (twenty counties are listed) * * *." Attached to each contract was a letter from Morris stating his desire and intention to represent Case in the area outlined by these twenty counties and the territory contained therein. Another provision of these contracts gave Case the right to withdraw any part of this territory upon Morris' failure to properly function in same. This territory is the same as contained in Morris' letter attached to and made a part of the December, 1961, industrial contract.

It is further seen by the course of dealings that this area was recognized as the exclusive territory of Morris for industrial equipment. The December, 1961, industrial contract contained a provision that in the event "Dealer resells goods purchased under the contract for direct delivery outside of Dealer's territory, Dealer will pay to the Dealer in the territory in which delivery is made 5% of the Dealer list price." This payment was for the latter's assumption of warranty provisions. Mr. Mooney testified that he was the Case franchised dealer for the industrial line in the Corpus Christi trade area. Testimony was introduced that Mooney was forbidden by Hodgson from selling a machine to a San Antonio contractor and subsequently was required to return it to Corpus Christi. There was other testimony that Hodgson required Morris to remove an agent from Webb County, which was in Mooney's territory, after Mooney complained.

Insofar as the industrial line is concerned, Case did not contend that it had any other dealer in the San Antonio trade area during the time in controversy. Reid was advised, early in 1962, by a Case agricultural dealer, that Morris had a newspaper ad published that Morris was the "exclusive dealer for Case industrial and utility equipment." Reid advised the dealer in reply that the ad was false, in that said agricultural dealer had a utility franchise also "until his contract was terminated as of May, 1962." There was no denial that Morris was the exclusive industrial dealer.

Insofar as the utility line is concerned, Morris was not given an exclusive distributorship by the contract of December, 1961, which was the only utility contract signed by him. As heretofore pointed out, Case provided that the utility line could be handled by both the agricultural and industrial divisions of its organizations. Morris repeatedly complained, through the industrial representatives (Hodgson and McMaster) that he could not compete with the agricultural dealers in sale of the utility line, and that without the utility sales he could not stay in business as an industrial dealer. Reid and other officials concerned with the overall direction of the Case Company were thereby forced to make the ultimate decision of whether there should be competition in the San Antonio area between the industrial and agricultural divisions on the utility line.

The Case decision, as stated by Reid in a letter of March 8, 1962, to an agricultural dealer whose utility line was cancelled effective May 8, 1962, was that it was absolutely vital that Case have industrial representation in the San Antonio area, and it was obvious that the heavy line could not live without the utility. Case determined that its future, at least in the San Antonio area, was in its industrial line rather than the agricultural line. The result was that the agricultural division cancelled the utility line of Spencer Bros. Equipment Co., although this San Antonio firm had for many years been one of its leading agricultural dealers, and had advised Reid that the cancellation of their utility contract would ruin the firm.

This cancellation left Morris as the exclusive industrial dealer in the San Antonio trade area and the only authorized utility dealer in San Antonio. This fact was confirmed to Morris by a letter written by McMaster on the letterhead of the General Office in Racine, Wisconsin, with copy to Hodgson and Mr. Cody. This arrangement did not prove satisfactory to Morris, in that Mr. Brucks, who was a Case agricultural and utility dealer in Con-

verse, Texas, commenced making utility sales in San Antonio and the San Antonio area by cutting the price under that quoted by Morris. Morris made many complaints through Hodgson and McMaster, and on one occasion Morris was given the amount of commission he would have earned on a sale which Brucks made to the San Antonio City Water Board. Finally, the utility contract of Brucks was cancelled in August, 1963. On January 23, 1964, McMaster wrote the purchasing agent of the City of San Antonio, advising that Morris was the only authorized dealer in the San Antonio area for distribution of Case industrial and utility products. A copy of this letter went to Reid, as well as to the general sales managers for both the agricultural and industrial divisions. On April 7, 1963, McMaster wrote Morris on the letterhead of the General Office, Racine, Wisconsin, advising that Bexar County had been assigned to the industrial division as their responsibility for the utility distribution.

Case urges that it is not responsible for the "course of dealings" by Hodgson and McMaster with Morris as found by the jury, in that the jury found that Reid did not have knowledge of same and no issue was submitted as to any other officer. This issue is unrelated to the defense of apparent authority, in that apparent authority as defined to the jury inquired of the conduct of Case. Rather, it relates to Morris' defense of ratification. It cannot be said that the jury finding of apparent authority is without support in the evidence, in view of the many transactions hereinabove enumerated which could only be performed in the general office of the Case Company and with the knowledge of Reid or other officials over both sales divisions. Hodgson was responsible for establishing and developing a proper industrial dealer organization. In this capacity he was the Case spokesman in San Antonio, and the record shows knowledge and acquiescence by Case, in that it carried out his request in cancelling the utility contracts of the

agricultural dealers in Bexar County and left Morris as the only authorized dealer.

It is true that on December 31, 1963, Morris advised Reid that he did not expect Case to "build a wall around his area," and in his reply of January 8, 1964, Reid assured Morris that there would continue to be "in line" competition. This competition was based on the fact that Brucks was able to buy utility machines from authorized dealers in other areas and deliver them in San Antonio. Brucks did this, however, without authority from Case. Neither Reid nor any other official over McMaster and Hodgson testified in this case.

When the record is considered under the "no evidence" test, as required to uphold Case's judgment non obstante veredicto,[3] there is evidence to support the issues that both Hodgson and McMaster, together with Morris, pursued an intentional course of conduct which enabled Morris to obtain the exclusive right to sell industrial machines in the San Antonio trade area and the exclusive right to sell utility machines in Bexar County; and that both Hodgson and McMaster had apparent authority from Case when each pursued this course of conduct. Marathon Oil Co. v. Hadley, Tex.Civ.App., 107 S.W.2d 883, writ dism'd. Such intentional conduct is prohibited by the Texas anti-trust statutes. Ford Motor Co. v. State, supra.

Case urges the Texas anti-trust laws have no application, since both the utility and industrial contracts provide that the goods purchased under the contracts are for resale at retail, and until full payment has been made therefor in cash to Case, title, ownership and right of property in such goods, together with right of possession in the event of default, shall be and remain in Case. Case urges that the anti-trust law applies only to outright sales, and therefore does not affect the transactions between it and Morris. See Barr v. Southwestern Wholesale Furniture & App. Co., Tex.Civ.App., 331 S.W.2d 343, no writ. It is seen on careful examination of the December, 1961, contracts that they are replete with references to the fact that the dealer *purchased* the goods from Case for resale and was not the agent of Case. Virtually every paragraph of these contracts contains language to that effect. Therefore, the reservation of title by Case was as security for the purchase price, and the transactions involved were sales and not shipments on consignment. Art. 5489, Vernon's Ann.Civ.St. (repealed eff. June 30, 1966); Dallas Farm Machinery Co. v. Minneapolis-Moline Co., Tex.Civ.App., 324 S.W.2d 578; Grand Prize Distributing Co. of San Antonio v. Gulf Brewing Co., supra.

It is the clear policy of the Courts of this State to leave the parties where they find them when the transactions sued upon are based on conduct in violation of the anti-trust laws. 13 Baylor Law Review 295, and authorities there collected. We sustain appellant's points that such conduct has been established by the jury's verdict in this case. Appellant's other points are immaterial.

The judgment of the trial court is hereby reformed to provide that the Clerk deliver the sum of $29,429.87, now in the registry of the court, to appellee Case Credit Corporation, and in all other respects the judgment is reversed and here rendered that the parties take nothing by their respective claims asserted herein. The costs of this appeal are taxed against the appellee Case Company.

---

3. Rule 301, Texas Rules of Civil Procedure; Sanders v. Harder, 148 Tex. 593, 227 S.W.2d 206 (1950).