434 F.2d 195
 In the Matter of WESTEC CORPORATION, Debtor.
Garland H. WALKER, Claimant-Appellant,
v.
Orville S. CARPENTER, Trustee for Westec Corporation, Debtor-Appellee.
 No. 28597.
 United States Court of Appeals, Fifth Circuit.
 October 20, 1970.
 Rehearing Denied December 3, 1970.
 
 COPYRIGHT MATERIAL OMITTED William B. Dazey, Houston, Tex., for claimant-appellant; Garland H. Walker, pro se.
 James W. Dilworth, Raymond A. Cook, Fred Knapp, Jr., Houston, Tex., for debtor-appellee; Andrews, Kurth, Campbell & Jones, Houston, Tex., of counsel.
 Before WISDOM, AINSWORTH, and CLARK, Circuit Judges.
 WISDOM, Circuit Judge.
 
 
 1
 This case tangentially relates to the collapse of Westec Corporation, a Texas corporation now in proceedings for reorganization under Chapter X of the Bankruptcy Act. The facts out of which it arises constitute a prescription for corporate collapse: loose stock transactions, a corporate acquisition made to placate and benefit a subsidiary's principal officer and, allegedly, double payment for an officer's activities.
 
 
 2
 Garland Walker asserts a claim of $383,000 against the Trustee in Bankruptcy based on an alleged contract with Westec. The district court disallowed the claim on the ground that no binding contract was entered into between Westec and Walker, denied Walker's motion for a new trial, and severed the Trustee's counterclaims, consolidating them with a plenary action previously filed by the Trustee. Walker appealed from these decisions. We affirm.
 
 
 3
 The case comes to this Court with a poorly developed record. The claimant changed the theory of his claim on the day of trial. At the end of the trial he sought an amendment alternatively basing recovery on quantum meruit although he had made no showing of the reasonable value of the services rendered. The claimant failed to show that the president of Westec, with whom Walker dealt, had authority to make the kind of contract alleged or that such a contract on Walker's part was consistent with his fiduciary obligations as a corporate officer. The president was not brought forward as a witness until after the trial. Much of the difficulty of the case stems from the claimant's confused recollections which were not cleared up during the trial.
 
 I.
 
 4
 In 1960 Walker moved from Texas to Australia, where he founded a supply company, Seismic Supply Australia Proprietary, Limited. He was managing director and owned thirty percent of the stock. In 1963 Westec[1] bought all of Seismic's stock. Walker received 15,000 pounds for his interest. He continued as chief executive officer and director of the wholly owned subsidiary, receiving an annual salary of $20,000 and 27,027 shares of Westec[2] stock.
 
 
 5
 In 1964 Seismic acquired 10 percent of Continental Rubber Proprietary, Limited, a small Australian heavy equipment contracting company, in return for loans and a loan guarantee. Later in 1964, an additional financial interest in Continental became available. This was in the form of stock in Export Bit of Canada, a corporation which held the remaining 90 percent of Continental stock. Walker tried to interest Westec in acquiring this stock, but Westec declined because the purchase of minority interests was against its policy. With the permission of Westec's president, Ernest M. Hall, Jr., Walker personally purchased 30 percent of Export Bit — which constituted a 27 percent interest in Continental — for 12,500 pounds.[3]
 
 
 6
 Continental was in deep financial trouble. Walker spent much of his time, while a full-time officer of Seismic, trying to reinvigorate Continental. Additionally, he lent the corporation about $43,000 of his personal funds. This was in addition to $227,000 lent to it by other shareholders of Export Bit.
 
 
 7
 In an effort to salvage his investment in Export Bit and to recover the money he had lent to Continental, early in 1965 Walker told Hall that he was going to quit Seismic and go into competition with it through Continental unless Hall made it worthwhile for him to stay with Seismic. He made various demands. One was that Westec acquire Continental, which Walker represented as a good investment for Westec. In addition to receiving remuneration for his equity and creditor interests in Continental, Walker was also to benefit from the transaction because of having arranged the acquisition. The other demands were a no-personal-liability loan of $50,000 to purchase 4600 shares of Westec stock, a 5000 share stock option at $12 3/8 a share, and a promise that Walker could shortly return to the United States to live. Hall agreed to these demands.
 
 
 8
 The Court found that upon the representations and assurances by Claimant that Continental was a good investment, Hall agreed to permit Claimant to attempt to acquire 100 percent of Continental stock. Walker would then exchange this for an undetermined amount of Westec stock. The price Westec was to pay was left completely open, with the understanding that the price would depend on what Walker had to pay for the interest and that later there would be adjustments based on profitability similar to those included in a previous Westec acquisition agreement.
 
 
 9
 The Court found: "For various reasons Claimant did not acquire the Continental Rubber stock personally and the original agreement was mutually abandoned. Furthermore, even if the agreement had not been abandoned, Claimant would have been entitled to no additional compensation since it was tied to future earnings of Continental Rubber, and the Court finds that Continental Rubber had no such net earnings at any time material hereto. Additionally, the so-called agreement was too vague and indefinite to be enforceable."
 
 
 10
 In June of 1965 instead of following the original two-step procedure Walker effected the purchase of Continental directly by Seismic. The Court found: "[T]he principal attraction to Debtor in acquiring Continental Rubber was to take advantage of a tax loss. The added advantage was to pacify Claimant by assuring that the loans he had made to the company would be repaid. The stock of Continental Rubber had no real value at the time of the acquisition as the liabilities of the company exceeded its assets by a substantial amount. However, Debtor's total outlay was far from nill as it assumed, and subsequently paid, Continental Rubber's indebtedness to the Export Bit shareholders, including Claimant, in the approximate amount of $270,000."
 
 
 11
 Walker wrote Hall on August 12, 1965, seeking remuneration in lieu of the profit he had contemplated under the two-step proposal. He referred to "the problem of compensating (him) for the amount of 12,500 pounds outlayed to obtain a personal interest in Continental Rubber * * *." Hall responded October 15: "We agree to issue to you 7,000 shares of Western Equities Inc. for your stock investment in Continental Rubber. It is understood that this will be the total paid by Western for 100% of the stock of Continental * * *." The Board of Directors did not authorize the issuance of the stock to Walker. It did authorize an option to him for the same number of shares.
 
 
 12
 Walker objected that he had been promised shares "free and clear" rather than an option. Hall pressed him to take the option in its place, as the best that he could arrange for Walker. Hall personally promised in a letter of April 20, 1966, to protect him against any loss by personally guaranteeing to reimburse him for the option price in the amount of $383,250 if the value of Walker's holdings in Westec did not reach $2.5 million by the end of 1967. Walker accepted and executed the stock option agreement. He continued, however, to seek the 7,000 shares outright.
 
 
 13
 Between the time Hall wrote offering 7,000 shares outright and the March 15, 1966, Board of Directors' meeting at which Walker asserts his shares were to be issued, the market price of Westec's shares sextupled. Walker's claim for $383,000 is based on the price of 7,000 shares of Westec stock as of March 15, 1966.
 
 
 14
 On this sequence of events, the Court disallowed Walker's claim in its entirety. It based this decision on two main grounds. (1) It found that "no binding and enforceable legal contract was ever entered into between Debtor and Claimant". The agreement with respect to the 7,000 shares was void because it was induced by material misrepresentations and was beyond the authority of the president. (2) The court found that "even if any such contract" had been entered into, it was novated by Walker's acceptance of the 7,000 share option and Hall's personal guarantee.[4]
 
 
 15
 On appeal, the parties agree implicitly that Texas law applies to this case.
 
 II.
 
 16
 The appellant raises several points in attacking the district court's finding that no enforceable contract was entered into for the 7,000 shares.
 
 
 17
 A. The first point urged by Walker is that the trial court erred in finding that Hall had no authority to contract for the issuance of Westec's capital stock. Walker asserts that the actions of a corporate president are presumed to be within the scope of his authority absent contrary proof. But Texas law is clearly to the contrary. As to actual authority,
 
 
 18
 * * * one who seeks to hold a corporation liable upon a contract made by an agent has the burden of proof, not only the execution of the contract for the corporation, but the authority of the agent through whom it is claimed the corporation acted.
 
 
 19
 Adkins-Polk Co. v. Pate, Tex.Civ.App. 1928, 11 S.W.2d 654. See Perper v. Sonnabend, 5 Cir. 1955, 221 F.2d 142, 144. As to apparent authority, the plaintiff had the burden of proving
 
 
 20
 * * * such conduct on the part of the principal as would lead a reasonably prudent person, using diligence and discretion, to suppose that the agent has the authority he purports to exercise.
 
 
 21
 Chastain v. Cooper & Reed, 152 Tex. 322, 331, 257 S.W.2d 422, 427 (1953).
 
 
 22
 The record supports the trial court's findings of neither real nor apparent authority. Walker made no showing with respect to Hall's actual authority. In fact, the law generally on this point is that the president has "no authority to bind the company by a contract for the issuance of its capital stock". 2 Fletcher Cyclopedia Corporations § 604 (1969 rev.). As to apparent authority, Walker asserted only that Hall had in the past fulfilled promises of stock. But a finding of apparent authority depends on the standard of the reasonable man using diligence and discretion. An insider, such as Walker, has no license to rely on such authority. Additionally, Walker indicates in his testimony that he knew that it was the board's responsibility to issue stock. He knew that the stock option promised at the same time as the shares outright had to be submitted to the board. He also knew that he would have to wait for the board meeting to get his 7,000 shares; it was the date of the directors' meeting that Walker later set up as the date of default by calculating damages on the basis of the day's stock prices.
 
 
 23
 B. Walker next asserts that the rule that knowledge of the president is imputed to the corporation somehow overcomes Hall's lack of authority. If this were the rule, there would be no effective limitations on the contracting authority of corporate officers. The cases do not support Walker's claim. Rather, they hold only that imputation of officers' knowledge to the corporation works together with the rule that a corporation is estopped to deny its officers' authority to make a contract when the corporation accepts the benefits of the contract knowing of the concomitant contractual burdens. See Vogel v. Zipp, Tex.Civ.App.1936, 90 S.W.2d 668.
 
 
 24
 Walker does assert the retention-of-benefits theory as a separate basis for his contract claim against Westec. He argues that Westec is estopped to assert Hall's lack of authority because it continues to enjoy the benefits of the contract, retaining Continental within its corporate family. Texas law supports such a theory of claim. See Whitten v. Republic National Bank of Dallas, Tex.1966, 397 S.W.2d 415.
 
 
 25
 If Walker were unrelated to Westec, such a theory would be arguable in this case. But here it does not apply. The essence of the rule is a purpose to keep the corporation from being unjustly enriched at the expense of the other contracting party. Here there is no evidence that Westec was enriched. The trial court found that Walker would have received nothing under the first agreement since there were no profits. More importantly any enrichment was not unjustly at the expense of Walker. Westec should not have had to pay Walker any special fee for arranging the acquisition since these services were within Walker's regular duties as manager of Seismic. Walker was liberally compensated in this post. Beyond this, Walker benefitted personally from the acquisition in that Continental's obligation to repay him $45,000 was met by Westec. Thus Walker has no equitable claim of unjust enrichment.
 
 
 26
 Walker cites two Texas statutes to support his claim of estoppel. They are not in point. V.A.T.S., Article 1351, which requires a corporation to disavow certain acts of officers within one year to avoid attribution to the corporation, refers to acts statutorily prohibited to the corporation under penalty of corporate dissolution. V.A.T.S. Bus. Corp.Act, Article 2.04, which ends the corporate defense of incapacity, refers to acts beyond the charter authority of the corporation rather than beyond the authority of particular officers of the corporation. Here Westec's claim is simply that Hall was not empowered to make such a contract for Westec.
 
 
 27
 The Court's findings of fact are not clearly erroneous. We agree with its conclusion of law that no binding and enforceable legal contract was entered into obligating Westec to pay Walker anything of value over his salary for the services (if any) rendered in Seismic's acquisition of Continental Rubber.
 
 III.
 
 28
 Walker additionally attacks the trial court's alternative holding that even if a valid contract was made to pay Walker 7,000 shares it was novated by mutual agreement. The court found that Walker's acceptance of the 7,000 share option constituted a novation. Hall got this option for Walker from the board on March 15, 1966. Walker objected to it as not fulfilling the agreement for shares free and clear. Hall urged Walker to accept it in substitution for 7,000 shares outright because he could not get that for him. Hall further gave his own personal promise to reimburse Walker for the option price if the value of Walker's stock did not reach a certain figure by a specified date. Walker subsequently accepted the option without any express declaration of intention.
 
 
 29
 Walker argues that the Trustee failed to prove consideration and the intent to extinguish the prior agreement. But there was legal consideration in the offer of the option coupled with Hall's promise to guarantee the option price. Even though this might appear less attractive than what it was replacing, it is legal consideration.
 
 
 30
 Default had already occurred and (the defaulter) could conceivably stand on its breach and pay the resulting damages, if any, with less risk than it would assume under the new contract. In other words, (the defaulter) was under no legal duty to make the new commitment, and in doing so suffered a legal detriment, which is in itself sufficient consideration for (the) new agreement.
 
 
 31
 Jack R. Allen & Co. v. Farris & Co., Tex.Civ.App.1963, 372 S.W.2d 582. And if the option is viewed as an unconditional grant by the board which was Walker's without his giving up the former rights, Hall's personal promise is consideration for Walker's giving up his former rights.
 
 
 32
 Whether Walker agreed to extinguish any existing rights is a question of fact. The trial court's finding of a novation is supported by the evidence. Contrary to Walker's argument that it would have been unreasonable to accept an option in place of shares outright, such an action was reasonable given the situation. Hall had told Walker that he could not get the 7,000 shares free and clear for him. He asked Walker to accept the option as a substitute and personally promised to pay Walker the option price if the stock did not appreciate to a certain value by a specified date. This communication occurred at a time when the market value of Westec's stock had sextupled within a number of months, and it was reasonable to expect further appreciation.
 
 
 33
 Hall's offer of the option plus his personal promise were in writing, as was Walker's subsequent execution of the option. Walker testified at the trial that between Hall's offer and his acceptance of the option he told Hall that he would not take the option as a substitute and that Hall told him to take the option without giving up his claim since the board had already acted on the option. The trial judge chose to disbelieve this uncorroborated testimony, as he was entitled to do.
 
 IV.
 
 34
 Beyond the issues of Hall's lack of authority and the novation is a more basic question: whether Walker's claim is contrary to his fiduciary obligations as manager and director of Seismic. For his work with Seismic Walker received an annual salary of $20,000 plus many Westec stock options. In return he was expected to devote his full energies to the corporate interest. He had a fiduciary obligation requiring "the dedication of his uncorrupted business judgment for the sole benefit of the corporation." International Bankers Life Ins. Co. v. Holloway, Tex.1963, 368 S.W.2d 567, 577. Given this obligation, Walker's claim to an additional large amount of compensation for engineering Seismic's acquisition of a corporation in which he had a large financial interest must fail for several reasons.
 
 
 35
 Because of his fiduciary obligation, an officer's contract with his corporation for his personal gain will be subjected to the scrutiny of courts. It will not be upheld unless the officer shows that it is fair and made in good faith. Popperman v. Rest Haven Cemetery, Inc., 1961, 162 Tex. 265, 345 S.W. 2d 715; International Bankers Life Ins. Co. v. Holloway. Thus if Walker had made the alleged contract with the board of directors of Seismic, the contract would be voidable.
 
 
 36
 Here the claimed contract was made not with Walker's own corporation, the subsidiary, but with the parent corporation. Yet this variation does not avoid Walker's fiduciary duty. Since the relationship between Westec and Seismic was more like relations within an enterprise than relations between shareholder and company, Walker's obligations should be seen as running to the shareholders of Westec. In the circumstances of this case the agreement between the president of the parent and the manager of the subsidiary falls within the voidable contract rule.
 
 
 37
 In the trial below Walker made no explicit attempt to show fairness or good faith. From the record it can be seen that unfairness and bad faith prevailed. First, Walker was engaged in promoting an acquisition that would benefit himself. He had lent about $45,000 to Continental, the corporation was in financial trouble, and its ability to pay off its loans was in serious doubt. Because of this personal stake in the transaction, Walker would have to show that the acquisition was a good business move for Seismic in order to show that he was acting properly. Yet he made no showing of the value of the acquisition. The district court found that Continental had no real value at the time of the acquisition as its liabilities exceeded assets by a substantial amount.
 
 
 38
 Second, whatever Walker contributed to Continental's possible value and to arranging the acquisition belonged in equity to Seismic independent of any additional contract. Walker had spent much time trying to invigorate Continental, time that he owed Seismic as its manager and director. And the engineering of the acquisition of Continental was within Walker's regular duties as manager and director of Seismic. Therefore Walker's claim for compensation for invigorating Continental and arranging the acquisition constitute an attempt to be paid twice for his efforts.[5]
 
 
 39
 Because of the doubtfulness of Walker's equitable claim to any remuneration for effecting the acquisition, any recovery by him would require at least a showing of a very clear contract in which the representatives of the corporation understood exactly what they were getting and what they were going to pay Walker in return so that they could make an informed judgment about the fairness of the contract.
 
 
 40
 Yet clarity is strikingly absent from the contract alleged by Walker. There was no attempt by Walker fully to inform Hall about the financial condition of Continental or about his own financial stake in the corporation. Additionally, Walker's theory of compensation was constantly changing. Under the first proposal, remuneration was tied to Continental's profits. The trial court found that, as there were none, he would have received nothing. After the acquisition was effected directly by Seismic, Walker sought a new agreement on remuneration, including a way "of compensating me for the amount of 12,500 pounds outlayed to obtain a personal interest in Continental Rubber Pty. Ltd., an interest which has now been transferred to Seismic Supply at no cost * * *." Apparently Hall misunderstood the basis for Walker's claim, seeing it in light of the first proposal by which Continental was to be bought from Walker. Thus he responded: `we agree to issue to you 7,000 shares of Western Equities, Inc., for your stock investment in Continental Rubber. It is understood that this will be the total paid by Western for 100% of the stock of Continental * * *." This response assumes that Seismic had not yet fully acquired Continental and that Walker's investment was to be bought as part of the acquisition. Yet Continental had already been completely acquired for $270,000 — the amount of loan repayments that Continental owed to its shareholders.
 
 
 41
 In this muddy situation, Walker failed to show that the claimed contract was fair and in good faith. That Walker gave no attention at the trial to justifying his contract as consistent with his fiduciary duties is illustrative of how little concern he had for them.
 
 V.
 
 42
 Walker objects additionally to several other actions of the trial court.
 
 
 43
 A. First, he asserts error in the trial court's denial of his motion to amend his pleadings at the end of the trial to conform to the evidence. In this amendment he sought to include prayers for relief on theories of quantum meruit, ratification, and estoppel.
 
 
 44
 Denial of an opportunity to amend is within the discretion of the district court. Rule 15(a) declares, however, that leave to amend "shall be freely given when justice so requires". See Foman v. Davis, 1962, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222, in which the Supreme Court held that the district court erred in denying a motion to vacate a judgment to enable amendment of the complaint. But in that case there was no apparent or declared reason for denying leave to amend the complaint. Here the district judge's findings of fact and conclusions of law ruled on the substance of the quantum meruit claim explicitly: "The record does not support or justify any recovery in any amount upon the theory of quantum meruit for the claimed value of services rendered." Cf. Young v. Johnson, 10 Cir. 1960, 286 F.2d 365; Adkins v. E. I. Du Pont De Nemours & Co., 10 Cir. 1949, 176 F.2d 661, cert. denied 338 U.S. 895, 70 S.Ct. 234, 94 L.Ed. 550 (1949), cert. denied 339 U.S. 935, 70 S.Ct. 661, 94 L.Ed. 1353 (1950).
 
 
 45
 The quantum meruit claim was unsupported by any evidence as to value. Walker argued that he showed the value of the corporation and the expense he incurred in personally buying a 30 percent interest in the parent of Continental. But the evidence on the value of the acquisition was inconclusive. And no evidence of the value of the services was submitted. Additionally, Walker has no right to recover any value. The services involved already belonged to Seismic. And Walker's claim to the amount he invested in Export Bit has no basis. That was a personal investment in a company that ran into financial difficulties. Westec fully paid for the company by assuming its obligations to its shareholder-creditors. In fact, after getting all the other shareholders to agree to give up Continental for only the loan repayments, Walker is in a poor position to argue for further payment for his equity interest.
 
 
 46
 Further, all three theories put forward in the attempted amendment must give way before our holding that Walker's alleged contract was a breach of his fiduciary obligations. By this holding Walker can recover nothing on any theory supporting a contract claim.
 
 
 47
 B. Walker also seeks a new trial based on the affidavit of Hall — secured after the judgment below — contradicting various findings of the trial court. Hall was not made a witness by either party during the trial. Although in prison, he would have been available as a witness and Walker clearly knew before the trial of the materiality of testimony that Hall could give. Additionally, there is no likelihood that Hall's testimony would produce a different result. Walker's claim that he could not have foreseen that the trial court would reject his claim without Hall's testimony is the claim of every defeated plaintiff. Walker's omission cannot now require a new trial. The trial court's denial of the motion was within its discretion. Haugh v. Curlee, 5 Cir. 1959, 265 F.2d 130.
 
 
 48
 C. Walker further objects to the trial court's findings of fact and conclusions of law. He asserts that the court adopted verbatim a memorandum submitted by the Trustee. Such a practice deprives this Court of the aid of "a trial judge's `independent judicial labors and study.'" Edward Valves, Inc. v. Cameron Iron Works, Inc., 5 Cir. 1961, 289 F.2d 355, 356; see Otis, "Improvements in Statement of Findings of Fact and Conclusions of Law," 1 F.R.D. 83 (1940). But "the same test is applied to findings, whether the court prepared them or adopted those submitted by counsel." Edward Valves, 289 F.2d at 356. There was no error in the trial court's denial of Walker's motion to strike the findings and conclusions.
 
 
 49
 D. Finally, Walker argues that the trial court's order severing one of the Trustee's counterclaims and consolidating it with another action is ambiguous and prejudicial and that it was unauthorized. From the record and the court's order it is clear that the counterclaim involved was the one charging Walker with engaging in stock manipulations to the detriment of Westec. There is no error in the court's order. The appellant has made no showing of any prejudice on the merits that will result from this act of judicial economy.
 
 
 50
 The appellant asserts that the bankruptcy court had no authority to sever the counterclaim and consolidate it with a case on the general civil docket of the court because bankruptcy courts are separate and distinct. But this reasoning is unsound. Though the bankruptcy case and the civil plenary matter may historically have been separated in different courts, today they are assigned to the same courts. The distinction between law and equity, except for substantive rules of law, has been abolished. Although the court's jurisdiction for the bankruptcy case and that for the civil matter proceed from different sources, it is one and the same court handling these matters. Since the counterclaim could admittedly have been joined with the Trustee's plenary action originally, there is no reason to prevent the district court sitting as a bankruptcy court from severing it and consolidating it with the plenary matter also pending in the court.
 
 
 51
 The judgment below is affirmed.
 
 
 
 Notes:
 
 
 [1]
 Seismic was actually bought by Geo Space Corporation, a predecessor of Westec. For simplicity, the purchase is here attributed to Westec
 
 
 [2]
 Walker had received 100,000 shares of Geo Space stock which he exchanged for 27,027 shares of Westec stock
 
 
 [3]
 Walker paid more than 12,500 pounds but he used this figure in his negotiations with Hall. Therefore this figure is used here for simplicity
 
 
 [4]
 The Court further found: "It is further found by the Court that Claimant, while an employee of Debtor, deliberately and maliciously, in violation of his fiduciary obligations to Seismic and Debtor, sought to pirate and entice away from Seismic various of its personnel, product lines and customers to enable him to organize a new company in competition with Seismic and that to a substantial and material extent he succeeded. He admittedly took one of Seismic's principal product lines which line accounted for approximately 1/3 of Seismic's total business."
 
 
 [5]
 Walker's original claim was that the 7,000 shares were reimbursement for the stock he owned in Export Bit, made worthless when that company's only valuable holding, Continental, was sold. That claim also had no merit. Seismic bought Continental from Export Bit and therefore Walker's Export Bit stock was not involved at all. Walker was paid for Export Bit's disposition of Continental to Westec: he received about $45,000 in the loan repayment negotiated as the price of the acquisition. And any special purchase of Walker's Export Bit stock by Westec would seem to involve aiding Walker in defrauding the other Export Bit shareholders, who agreed with Walker to sell Seismic for only the loan repayment
 
 
 ON PETITION FOR REHEARING
 PER CURIAM:
 
 52
 The petition urges that the bankruptcy court had no jurisdiction of the Trustee's counterclaim. Without deciding that question, we held that the bankruptcy court did have authority to transfer the counterclaim to the civil docket of the same district court. Such authority is consistent with "the general purpose * * * of removing whatever obstacles may impede an expeditious and orderly adjudication of cases and controversies on their merits." Goldlawr v. Heiman, 369 U.S. 463, 466-467, 82 S.Ct. 913, 916, 8 L.Ed.2d 39. Cf. 28 U.S.C.A. §§ 1406 (c), 1506.
 
 
 53
 It is ordered that the petition for rehearing filed in the above entitled and numbered cause be and the same is hereby denied.