**COMMERCIAL CREDIT CORPORATION, Appellant,**

v.

**Randal C. BROWN et ux., Appellees.**

No. 8178.

Court of Civil Appeals of Texas, Amarillo.

Sept. 27, 1971.

Rehearing Denied Oct. 26, 1971.

Folley, Snodgrass & Calhoun, O. M. Calhoun, Amarillo, for appellant.

Gibson, Ochsner, Adkins, Harlan & Hankins, John A. Weber, Amarillo, for appellees.

REYNOLDS, Justice.

This appeal is from a take-nothing judgment entered in a suit brought on a retail installment contract by plaintiff-appellant Commercial Credit Corporation, assignee of the contract, against defendant-appellees Randal C. Brown and wife. Affirmed.

Initially, appellees challenge appellant's points of error as being multifarious and too broad, general and indefinite to give notice of the error relied upon. In view of the nature of this case, we believe the points of error as presented are only "no evidence" points that are sufficient to direct the court's attention to the errors relied upon, and we will consider them. Fambrough v. Wagley, 140 Tex. 577, 169 S.W.2d 478 (1943); International Security Life Ins. Co. v. Arant, 463 S.W.2d 523 (Tex.Civ.App.—Amarillo 1971, writ ref'd n.r.e.).

Trial was to the court without the intervention of a jury and after the rendition of judgment for appellees, the appellant made no request for findings of fact or conclusions of law, and thus none were made or filed by the court. It must be presumed that the trial court resolved in appellees' favor every issue of fact raised by the evidence, and we must view the evidence in the light most favorable to the court's findings, disregarding all that is contrary thereto. Quinn v. Dupree, 157 Tex. 441, 303 S.W.2d 769 (1957). Therefore, it is the duty of this court to affirm the trial court judgment if it can be upheld on any legal theory that finds support in the evidence. Seaman v. Seaman, 425 S.W.2d 339 (Tex.Sup.1968).

A brief statement of the evidence adduced becomes necessary. While the evidence is not conducive to a pellucid record revealing the background and transactions involved in this suit, the record supports the following narrative of the events leading up to and embracing the controversy. Appellant's Amarillo office and Dale McLaughlin, dba Dale's Motor Company in Dumas, had entered into several agreements in regard to the financing of some of the cars McLaughlin had in stock for sale and sold. One agreement was a floor

plan or wholesale agreement whereby appellant financed the cars in stock and McLaughlin paid appellant as each car was sold. Another agreement was a retail financing agreement whereby appellant would purchase from McLaughlin retail installment contracts entered into between McLaughlin and various purchasers if and after appellant had approved the contracts. It was McLaughlin's testimony that he received clearance from appellant before any retail installment contract was executed, that he never completed any of the contracts because he "didn't know how to fill them out all the way," and that appellant completed the contract after it was signed. Appellant's office manager testified that some contracts were approved in advance, and all transactions accepted by appellant were those in which the credit and terms were checked before the transactions were made. McLaughlin would assign the contract to appellant in return for appellant's payment by bank draft of the purchase price balance financed and perhaps any amount shown in the contract for credit life insurance. Appellant, as assignee, then looked to the purchaser for payment of the amount financed[1], together with the finance charge computed at the interest rate shown, in stated installments. The contract gave appellant a security interest in the automobile financed. Appellant and McLaughlin also had an agreement whereby McLaughlin was to furnish appellant the certificate of title to the financed automobile within 60 days following the transaction. In addition, there was an agreement by which McLaughlin agreed that appellant would be furnished an insurance policy on all cars sold by McLaughlin and financed by appellant in those transactions where the insurance was not included in the contract.

Appellees owned two cars, a 1967 Plymouth Fury two-door and a 1966 Opel, financed for an undisclosed amount with CIT Corporation. Appellees approached McLaughlin to refinance the cars. After clearing the terms and figures with appellant, on June 8, 1969, appellees and McLaughlin entered into the retail installment contract sued upon, which reflected a sale of appellees' two cars by McLaughlin to appellees for a cash sale price of $2,225.00. It was McLaughlin's testimony that appellant's employees prepared the contract, but there is no evidence that appellant was advised the transaction was a refinancing arrangement rather than a cash sale. A $500.00 cash down payment to McLaughlin was shown on the contract with the "unpaid balance of cash price" shown as $1,725.00. Credit life insurance purchased by appellees cost $19.84, so that the total of the "principal amount financed" was $1,744.84. Appellant's finance charge was $278.84, resulting in a "time balance" amount of $2,023.68, payable in 24 equal monthly installments of $84.32 each, with the first installment to become due and payable on August 25, 1969. The contract, hereinafter referred to as the "first" contract, was assigned to appellant on the day it was executed, and appellant remitted to McLaughlin. The record is contradictory as to whether McLaughlin was paid $1,744.84, the balance of the purchase price and credit life insurance premium shown in the contract, which he acknowledged receiving, or $1,725.00, representing only the reflected purchase price balance, shown by appellant's records to have been paid him. The disposition of the funds received by McLaughlin is not disclosed. Appellant never received the certificates of title to the two automobiles, and appellant's office manager testified he supposed it was for the reason "I never had applied for them showing a lien."

Later, on July 25 of the same year, and one month before the first payment was due under the first contract, appellees decided to purchase a certain 1969 Buick

---

1. The amount financed was the unpaid cash purchase price balance, and any sums advanced for license, title, transfer, and registration fees, official filing fees, vehicle insurance, credit life insurance, and for any other purpose.

automobile from McLaughlin, and asked McLaughlin if the 1967 Plymouth financed by and secured in the first contract could be traded in. McLaughlin's testimony is that he took a blank contract form, furnished by appellant, to appellant's office manager who "okayed" the trade-in of the Plymouth. It is the testimony of the office manager that he approved the credit and terms of the transaction but did not know that the trade-in was the same Plymouth financed in the first contract. The retail installment contract, hereinafter referred to as the "second" contract, was completed and executed in Amarillo by appellee Randal C. Brown and McLaughlin on July 25, 1969, and assigned to appellant on the same date. Abbreviated in form, the record of transaction contained in the second contract reads as follows:

| | | | | | |
|---|---|---|---|---|---|
| 1. | Cash Price | | | | $3585.00 |
| | | Trade-in | | | |
| | | 67 Ply. Fury Sport 2 Dr. | | | |
| DOWN | a. | Gross Trade-in | | $2090.00 | |
| PAY- | b. | Less Amount Owing | | $1590.00 [2] | |
| MENT | c. | Net Trade-in | | $ 500.00 | |
| | d. | Cash | | | |
| 2. | Total Down Payment | | | | 500.00 |
| 3. | Unpaid Balance of Cash Price | | | | $3085.00 |
| | * * * * * * * * | | | | |
| 6. | Vehicle Insurance | | | | $ 269.25 |
| 7. | Credit Life Insurance | | | | $ 59.98 |
| | * * * * * * * * | | | | |
| 9. | Amount Financed | | | | $3414.23 |
| 10. | FINANCE CHARGE | | | | $ 666.01 |
| 11. | ANNUAL PERCENTAGE RATE 11.96% | | | | |
| 12. | Total of Payments | | | | $4080.24 |

The $4,080.24 total of payments was scheduled to be repaid in 36 monthly equal installments of $113.34, with the first installment becoming due and payable on September 5, 1969. Upon assignment of this second contract, McLaughlin testified he received $3,144.90, which would total the unpaid purchase price balance of $3,085.00 and the $59.98 credit life insurance premium, from appellant; however, the draft drawn by McLaughlin in connection with the transaction and introduced in evidence shows that he received only the $3,085.00 purchase price balance. In any event, no amount was withheld by or then paid to appellant to pay the amount owing on the first contract, although the testimony of appellees and McLaughlin is that the Plymouth was traded in with the understanding that the amount owed on the first contract would be paid by McLaughlin.[3] McLaughlin took possession of the Plymouth,[4] the Buick was delivered to appellees, and appellant subsequently received the certificate of title for the Buick.

2. The computation of this amount as owing is unexplained. On the date of this contract, no payment had been made or credited to the first contract. The original unpaid purchase price balance shown in the first contract was $1,725.00, and the credit life insurance premium was $19.84, with accrued interest on the total of $1,744.84 since June 8, 1969.

3. McLaughlin testified appellant was paid by credit on his account or by check, but he had no evidence of either.

4. This peregrinating Plymouth was sold by McLaughlin to another purchaser, who financed the purchase with appellant, and later, upon default in payment, appellant repossessed the Plymouth and sold it.

No payment was made on the first contract on or before August 25, 1969, the due date of the first installment. Sometime thereafter, in October as the appellees recalled but on September 12, 1969, as reflected by appellant's records, appellee Mrs. Brown, in response to receipt of appellant's notice of delinquency under the first contract, telephoned appellant's office manager. Her testimony was that the office manager told her that " * * * this contract was taken care of * * *," which was denied by the office manager. Appellant's "Bills Receivable" card, introduced in evidence, confirms a telephone conversation with this notation: "9/12—Ph—She says traded on Buick—Dale's deal—She just called Dale—call her after talk to Dale." McLaughlin testified that he received a telephone call from Mrs. Brown in regard to the delinquent notice, that he advised Mrs. Brown to call appellant's office manager, and that he checked with appellant and was told by the office manager that the first contract "was cleared out." However, the next notation on appellant's card is: "9/12—ph dlr—he to pay off this contract when in next wk."

Appellees deny making any payments on the first contract. The evidence discloses that from some unidentified source appellant received a payment on September 30, 1969, and credited it to the August 25, 1969, installment; and the September 25 and October 25 installments were paid by an unidentified check received on October 7, 1969.

At some inexplicit time after execution of the second contract, it developed that appellees desired to provide their own vehicle insurance on the 1969 Buick, rather than it being provided for them as indicated in the contract. Appellant prepared and on October 23, 1969, forwarded to appellees a third retail installment contract, dated July 25, 1969, the same date as and identical to the second contract, except

that: the $269.25 amount shown in item 6 for vehicle insurance was eliminated; the amount shown financed in item 9 was changed to read $3,144.98; the item 10 finance charge was corrected to read $613.-42; the deferred payment price in item 13 was reduced to $3,758.40; and the monthly installments were reduced to $104.40. Appellant's transmittal letter requested the contract be signed, which was done by Mr. Brown, and returned to appellant, who would have McLaughlin sign it and then advise appellees of the new payment schedule. Appellees made 14 regular payments on the Buick contract until November, 1970, when the balance was paid to appellant.

Appellant's "Bills Receivable" card, under the date of October 30, 1969, has this notation: "Dale to pay off *Sold*." Appellant's office manager testified that on this date he had a conversation with McLaughlin in which McLaughlin "said he was going to take care of it, going to pay if off, but he never did pay if off." The conversation was brought about "(w)hen we found out that the—one of the cars had been traded in and that he was supposed to have paid it off, that's when he was supposed to pay it off."

Thereafter, on December 23, McLaughlin delivered two checks to appellant in payment of the November 25 and December 25 installments on the first contract, but both checks were returned unpaid because of insufficient funds.[5] No further payment was credited to the first contract. At or near the same time, appellant prepared a report to the credit bureau showing, among other information, the following: "charged off $1,744.58 on 12–23–69. Charge off of 1967 Plymouth—serial #PS23H76196211 and 1966 Opel serial
traded
#310 773185. Cars sold back to Dealer. Dealer sold units [6] and didn't pay account off."

---

5. McLaughlin was not asked if he made the three prior payments credited to the first contract.

6. This is the only information in the record concerning the Opel automobile since its inclusion in the first contract, but the

■ In response to appellant's suit filed only against appellees [7] on February 3, 1970, seeking recovery of $1,770.72 under the first contract, and reasonable attorney's fees, appellees interposed the specific defenses of accord and satisfaction, novation and payment. Reviewing the evidence in the light most favorable to the court's judgment, and disregarding that contrary, as is required of us, we conclude there is sufficient evidence of probative force to uphold the trial court judgment on the legal theory of novation. The evidence supports the trial court's implied finding that appellant agreed to release appellees from their obligation under the first contract, agreeing to look instead solely to McLaughlin for the payment of that contract and releasing appellees from liability.

■ To constitute a valid novation, four essential elements must be proven: a previous valid obligation; a mutual agreement of all parties to acceptance of a new contract; a substitution of the new contract for the old, effecting its extinguishment; and a valid new agreement. Utay v. Urbish, 433 S.W.2d 905 (Tex.Civ.App.—Dallas 1968, writ ref'd n.r.e.); 41 Tex. Jur.2d, Novation § 7, p. 554. An express release is not necessary to effect a discharge of an original obligation by novation. The intent or agreement to accept the new obligation in lieu and in discharge of the old one may be inferred from the facts and circumstances and conduct of the parties. A novation agreement need not be in writing or evidenced by express words since, like any other ultimate fact, it may be inferred from the acts and conduct of the parties and other facts and circumstances. Chastain v. Cooper & Reed, 152 Tex. 322, 257 S.W.2d 422 (1953); Utay v. Urbish, supra; 41 Tex.Jur.2d, Novation, §

12, p. 564. And whether the taking of a new debtor is intended to operate as a release of the liability of the old, in the absence of an express agreement to that effect, is usually a question of fact, and can only become a question of law when the state of the evidence is such that reasonable minds cannot differ as to its effect. Chastain v. Cooper & Reed, supra.

The first contract obviously was a valid obligation. McLaughlin's undisputed agreement with appellees to accept the Plymouth in satisfaction of appellees' debt evidenced by the first contract; the testimony of McLaughlin and appellees that appellant considered the first contract cleared out and taken care of, coupled with appellant's records showing McLaughlin was to pay the account, and presumably made payments on it, without any protest communicated to appellees; the failure of appellant to proceed sooner against appellees or against the Opel automobile under its security interest after being notified of the transaction as early as September 12, 1969, if appellant did not hold McLaughlin accountable; and the relationships of the parties, was sufficient evidence for the trial court to have found, in support of its judgment, a new mutual agreement for appellant to look only to McLaughlin for payment of the liability created by the first contract and to release appellees from their obligation under the first contract.

Having found the trial court judgment is entitled to be upheld on the theory of novation, this court is not required to explore the other theories upon which the judgment may have been rendered or be sustained.

The judgment of the trial court is affirmed.

testimony does not support this disposition.

7. At the time of trial, appellant had "12 or 15 suits" pending against McLaughlin

"on accounts such as this" and a judgment against him for "several thousand dollars."