TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-00-00322-CV






Computed Imaging Service, Inc./Fayette Memorial Hospital, Appellants



v.



Fayette Memorial Hospital/Computed Imaging Service, Inc., Appellees







FROM THE DISTRICT COURT OF FAYETTE COUNTY, 155TH JUDICIAL DISTRICT


NO. 96V-161, HONORABLE DAN R. BECK, JUDGE PRESIDING







 Computed Imaging Service, Inc. ("CIS") sued Fayette Memorial Hospital
("Fayette") for breach of a medical equipment lease. Although a bench trial resulted in a judgment
that imposed liability on Fayette, CIS challenges the legal sufficiency of the evidence to support
findings regarding mitigation of damages and the calculation of prejudgment interest. Fayette also
appeals, contending that it proved its defense of novation as a matter of law. Finding no reversible
error on these issues, we will affirm the judgment of the district court.


Facts

 In 1989, CIS, a company primarily involved in the sale, rental, and service of
medical diagnostic equipment, leased a computed tomographic scanner ("CT scanner" "CIS
scanner" or "the scanner") and accompanying services to Fayette on a shared basis. The shared-basis lease provided that the CT scanner would also be used by other healthcare providers
according to a prearranged schedule. Under this agreement, Fayette was the scanner's "home
base" and CIS organized transportation between sharing parties. In October 1992, the parties
signed a one-year renewal of their previous lease agreement ("October contract"). All periodic
agreements between CIS and Fayette, including the October contract, provided that Fayette was
to use only CIS's scanner and that monthly lease payments were based on the number of scans
performed.

 In May 1993, CIS and Fayette entered into an agreement specifying various changes
in their relationship ("May agreement"). The May agreement provided: (1) for Fayette's full-time, exclusive use of the CT scanner; (2) for a three-year term, effective September 9, 1993; (3)
that Fayette would supply its own operating technician; and (4) that CIS would construct a
suitable, permanent site for the CT scanner in Fayette's parking area. Under the May agreement,
as in all previous leases, Fayette was billed monthly on a "per scan" basis. From January 1994
through August 1995, Fayette averaged 43.5 scans per month and was charged $280 per scan; the
average monthly bill was $12,180.

 On September 9, 1993, Fayette commenced its exclusive use of the CT scanner. 
By the fall of 1994, Fayette decided to seek bids for a helical CT scanner that could provide
superior image quality. Fayette inquired about whether CIS could provide a helical scanner and
what it would cost to buy out the remainder of the current three-year contract. Larry Fechik,
president of CIS, indicated that CIS could not provide a helical scanner and that Fayette could buy
out the current contract for $240,000. In September 1995, Fayette purchased and installed a new
scanner from another company and ceased use of the CIS scanner altogether. CIS was aware of
the purchase and notified Fayette that it was in breach of contract. However, the CIS scanner
remained at Fayette for approximately four more months, until CIS removed it in December 1995. 
From April 1996 through expiration of the three-year term in September, CIS rented the CT
scanner to Weimar Hospital ("Weimar").

 In June 1996, CIS filed suit for breach of contract. In August 1999, Fayette moved
for summary judgment on its affirmative defense of novation. A docket entry indicates that the
trial court heard the motion, but there is no order in the record disposing of it. In October 1999,
after a bench trial, the court issued a letter to the parties declaring that Fayette had breached the
contract, and soliciting proposed findings of fact and conclusions of law. In January 2000, the
trial court rendered a final judgment awarding CIS (1) $36,540 in compensatory damages; (2)
prejudgment interest of 18% on compensatory damages, calculated from March 31, 1996 to the
date of judgment; and (3) $14,765 in attorney's fees. In response to a request from CIS, the trial
court issued findings of fact and conclusions of law, which state that (1) CIS failed to mitigate its
damages by failing to immediately remove the CT scanner from Fayette's premises in September
1995; (2) CIS was not entitled to recover damages for the period of September to December 1995;
and (3) the damages award had been reduced by the income received from the Weimar hospital
contract. In the meantime, Fayette filed a motion to modify, correct, or reform the final
judgment. The court granted the motion and vacated the portion of the judgment dealing with pre-
and post-judgment interest. In April 2000, the trial court issued its corrected final judgment,
changing the prejudgment interest rate from 18% to 6%, to be calculated from June 3, 1996
through the date of judgment.

Discussion


I. Novation

 Fayette asserts that the trial court erred by denying its motion for summary
judgment on its defense of novation.(1) By this point, Fayette also argues that it established its
novation defense as a matter of law at trial. We will examine all the evidence presented at trial
to determine whether this is the case.

 Fayette contends that the May agreement (1) constituted a novation, a new and
complete contract that did not contain an exclusivity term; and (2) extinguished the October
contract. Fayette argues that it therefore did not breach its contract with CIS by using another CT
scanner. A party must establish four essential elements to prove novation: "a previous valid
obligation; a mutual agreement of all parties to acceptance of a new contract; a substitution of the
new contract for the old, effecting its extinguishment; and a valid new agreement." Commercial
Credit Corp. v. Brown, 471 S.W.2d 914, 919 (Tex. Civ. App.--Amarillo 1971, writ ref'd n.r.e.)
(citations omitted).


The intent or agreement to accept the new obligation in lieu and in discharge of the
old one may be inferred from the facts and circumstances and conduct of the
parties. A novation agreement need not be in writing or evidenced by express
words since, like any other ultimate fact, it may be inferred from the acts and
conduct of the parties and other facts and circumstances.

Id. (citations omitted). "For there to be a novation it must clearly appear such was the intention
of the parties. Novation is never presumed." Allstate Ins. Co. v. Clarke, 471 S.W.2d 901, 907
(Tex. Civ. App.--Houston [1st Dist.] 1971, writ ref'd n.r.e.) (citations omitted).

 In dispute is whether the parties entered the May agreement in order to modify and
extend the October contract or to extinguish the October contract. In our review of the trial
court's attempt to discern the parties' intent, we are not limited to a review of the May agreement
alone; we may infer the parties' intent from the facts, circumstances, and conduct of the parties. 
See Commercial Credit, 471 S.W.2d at 919. Although the May agreement was titled "agreement"
not "modification" and could have stood alone as a new contract, the facts and circumstances of
its execution suggest otherwise. The parties' October contract was valid for twelve months or
until renewal, and was still in effect at the time of execution of the May agreement. The October
contract provided that it "superseded all prior agreements;" the May agreement did not. The
October contract was six pages in length; the May agreement was only one page. The October
contract contained numerous, typical contract terms governing warranty, billing, default, and
indemnity; the May agreement did not. In addition, we note that as a result of the May agreement,
CIS incurred significant new liabilities. The May agreement discontinued the shared-basis lease
and gave Fayette exclusive use of the CT scanner. This required CIS to purchase another scanner
to fulfill contracts with other providers who had shared use with Fayette. Furthermore, pursuant
to the May agreement, CIS paid for the construction of a permanent site for the scanner in
Fayette's parking lot. It seems unlikely that CIS would contract to incur these expenses at the
same time it agreed to waive the exclusivity provision; that provision would have been its only
guarantee of recouping the costs incurred in the May agreement. Otherwise, CIS subjected itself
to the risk that Fayette would immediately discontinue use of its CT scanner, at a significant loss
to CIS.

 In further support of its argument that the May agreement was a novation, Fayette
asserts that a new agreement may be inferred where it is so inconsistent with the original that the
two cannot co-exist. Scalise v. McCallum, 700 S.W.2d 682, 684 (Tex. App.--Dallas 1985, writ
ref'd n.r.e.). Except for the terms explicitly modified, we do not find any such inconsistency
between the October contract and May agreement. In particular, nothing in the May agreement
is in conflict with the exclusivity term in the October contract.

 Alternatively, Fayette urges that to the extent the May agreement is ambiguous, it
should be construed against the drafter, CIS. See AT&T Corp. v. Rylander, 2 S.W.3d 546, 559
(Tex. App.--Austin 1999, pet. denied) (stating general rule that document is construed strictly
against author). We hold that even if the May agreement was ambiguous and construed against
CIS, Fayette failed to prove an essential element of its novation defense, that is, the existence of
a mutual agreement to form a new contract. See Commercial Credit, 471 S.W.2d at 919. 
Therefore, the trial court could properly find that the evidence did not support the affirmative
defense of novation. See id. Fayette's cross-point is overruled.


II. Mitigation

 CIS asks us to review the legal sufficiency of the evidence to support the trial
court's mitigation findings for two time periods (1) September to December 1995, when the CT
scanner remained idle at Fayette; and (2) April to September 9, 1996, during which time the
scanner was leased to Weimar. CIS appeals the resulting reductions in damages.

 In reviewing a legal sufficiency, or no-evidence point, we must consider only the
evidence and inferences tending to support the finding of the trier of fact and disregard all
evidence and inferences to the contrary. Alm v. Aluminum Co. of Am., 717 S.W.2d 588, 593
(Tex. 1986); Garza v. Alviar, 395 S.W.2d 821, 823 (Tex. 1965). A no-evidence point must be
sustained when there is complete absence of evidence regarding a vital fact. Williams v.
Anderson, 850 S.W. 2d 281, 283 (Tex. App.--Austin 1993, writ denied). If there is more than
a scintilla of evidence to support the findings, a no-evidence challenge cannot be sustained. 
Catalina v. Blasdel, 881 S.W.2d 295, 297 (Tex. 1994).

 We first examine the issue of CIS's failure to mitigate. Mitigation of damages is
an affirmative defense. Cocke v. White, 697 S.W.2d 739 (Tex. App.--Corpus Christi 1985, writ
ref'd n.r.e.). "[T]he defendant claiming mitigation of damages has the burden not only to prove
lack of diligence on the part of the plaintiff but also to prove the amount by which the damages
were increased by such failure to mitigate damages." Id. at 744 (citation omitted).

 CIS contends that Fayette failed to meet its burden of proving that CIS did not
mitigate its damages from September through December 1996. CIS does not contest the finding
that it left its CT scanner at Fayette for four months after learning that Fayette was using another
scanner. It argues, however, that Fayette did not present any evidence that had CIS actively
pursued a rental to another hospital, there was a likelihood that CIS could have leased or sold the
CT scanner in dispute. On the contrary, CIS asserts that there was evidence that the other hospital
in question was not interested in the CIS scanner. In addition, CIS contends that it left the scanner
at Fayette in hopes of negotiating a new agreement with Fayette. CIS also argues that Fayette
failed to meet its burden of proving the amount by which damages were increased due to failure
to mitigate.

 Larry Fechik, the president of CIS, testified that he knew of Fayette's use of
another scanner, and thus the breach of the contract's exclusivity term, in September 1995. The
unchallenged fact that the CIS scanner was left on the Fayette premises for the next four months
could support either an inference of an attempted renegotiation, as CIS claims, or of a failure to
mitigate, as Fayette asserts. We must consider only the inferences tending to support the trial
court's findings. Alm, 717 S.W.2d at 593; Garza, 395 S.W.2d at 823. This evidence was
sufficient to prove CIS's lack of diligence. It was not necessary for Fayette to show that there
were other parties who would have agreed to rent or purchase the CT scanner. We conclude that
there was more than a scintilla of evidence to support the trial court's finding of failure to
mitigate.

 The evidence also supports the trial court's finding that CIS failed to mitigate
damages in the amount of $48,720. This deduction was calculated by multiplying the amount of
the average monthly scanner bill from January 1994 to August 1995 by the number of months CIS
left the idle scanner at Fayette ([43.5 scans per month x $280 per scan] x 4 months). CIS neither
contested the reasonableness of this method of calculating damages nor presented evidence that
the resulting sums were inaccurate. We hold that the amount of the average monthly cost for lease
of the scanner by Fayette constitutes more than a scintilla of evidence to support the deduction of
$48,720 for failure to mitigate damages. See Catalina, 881 S.W.2d at 297.

 Next, we examine the issue of CIS's actual mitigation of damages during the time
the scanner was leased to Weimar. The trial court reduced the damages award by $12,180 per
month from April 1996 through the end of the contract term, which was September 9, 1996. The
burden of proof as to the extent that damages were, or could have been, mitigated lies with the
party that has broken the contract. Powers v. Powers, 714 S.W.2d 384, 389 (Tex. App.--Corpus
Christi 1986, no writ); Houston Chronicle Publ'g Co. v. McNair Trucklease, Inc. 519 S.W.2d
924, 929 (Tex. Civ. App.--Houston [1st Dist.] 1975, writ ref'd n.r.e.).

 CIS contends that Fayette failed to meet its burden of proving the nature and extent
of mitigation. It asserts that the evidence was insufficient to support the following findings of fact
and conclusions of law made by the trial court:


 8. Plaintiff rented the subject CT scanner unit to the Weimar hospital within three
months of retrieving the unit from Defendant's premises.


 9. Plaintiff's damages, if any, must be reduced by the income received by
Plaintiff from the Weimar hospital contract. 


10. At most, Plaintiff's damages accrued for a period of seven months -- from
September 1995 to March of 1996, when the CT scanner was rented to the
Weimar hospital.


13. Plaintiff is only entitled to recover for damages for the period of three months
that it took Plaintiff to rent the CT scanner after Plaintiff retrieved the scanner.



CIS also challenges two implied findings: (1) that the CT scanner was rented to Weimar Hospital
for the entire time between April 1, 1996 and September 9, 1996; and (2) that CIS received
$12,180 in monthly net rental income during this period.

 Fechik testified to the fact that the CT scanner was rented to Weimar Hospital
approximately three months after its retrieval from Fayette. Although the testimony at trial was
brief, it was a sufficient basis for the finding that CIS actually mitigated its damages. Examining
only the evidence in support of the trial court's findings, we conclude that the testimony provided
more than a scintilla of evidence on which the trial court could find actual mitigation from April
1996 until the lease's expiration. See Catalina, 881 S.W.2d at 297.

 CIS also contests the trial court's deduction of $12,180 per month for the period
of actual mitigation. CIS contends that Fayette offered no evidence of the amount CIS actually
received from Weimar. Examining all of the evidence presented in support of the findings, we
conclude that there was sufficient evidence from which the trial court could infer that the amount
CIS received in actual mitigation was approximately the same as it would have received, on
average, from Fayette.

 Assuming that CIS provided approximately the same service to Weimar, using the
same scanner, the trial court could have accepted Fayette's evidence of past average monthly
billing as a reasonable estimate of future income for purposes of making a mitigation reduction
from the total actual damages. We also note that CIS offered no affirmative evidence to support
an alternative finding on the nature and extent of mitigation. Because CIS offered no contradictory
evidence to challenge the testimony supporting Fayette's claims on the mitigation issues, we are
obligated to conclude that the record contains sufficient evidence supporting the trial court's award
of damages. See Lakeway Land Co. v. Kizer, 796 S.W.2d 820, 824 (Tex. App.--Austin 1990,
writ denied). Accordingly, we hold that Fayette met its burden of proving the nature and extent
of CIS's actual mitigation. See id. CIS's mitigation issues are overruled.


III. Prejudgment Interest

 CIS contends that the trial court should have awarded prejudgment interest at a rate
of 18% from the sixteenth day after the month to which the damages apply, instead of 6% from
the date the lawsuit was filed, as specified in the modified final judgment. CIS bases its claim on 
paragraph seven of the October contract, titled "Billing," which reads in part: "Client will pay CIS
in full for previous month services within fifteen (15) days of receipt of each monthly statement. 
All past due amounts bear interest at the highest rate permitted by law payable on demand. The
obligation to pay fees is absolute, unconditional and not subject to offset." At all times relevant
to this dispute, the highest rate of interest allowed by Texas law was 18% per annum. See Tex.
Fin. Code Ann. § 304.002 (West 1998); Cavalcade Oil Corp. v. Samuel, 746 S.W.2d 842, 845
(Tex. App.--El Paso 1988, writ denied).

 In response, Fayette argues that paragraph thirteen of the contract, entitled
"Default," controls. That paragraph defines default as occurring if a client "defaults in the
payment of any sum of money due under this agreement" or "in the performance of any other of
its obligations under this Agreement." Paragraph thirteen also specifies that upon default 


Client shall pay and be liable for all past due fees and other sums called for by this
Agreement, plus damages equal to the net present value of all future profits to be
earned by CIS during the term of this Agreement. For purposes of the net present
value calculation, a discount factor of 6% per annum shall be used.



Fayette interprets this provision as applicable to a breach and argues that it sets 6% as the measure
of prejudgment interest on future profits awarded as damages. Fayette further contends that case
law and the Texas Finance Code govern the starting date for interest accrual. See Tex. Fin. Code
Ann. § 304.104 (West Supp. 2001); Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.,
962 S.W.2d 507, 531 (Tex. 1998) (holding that in common law breach of contract case, accrual
dates are same as set by section 304.104 of Texas Finance Code, previously applicable only to
judgments in wrongful death, personal injury, and property damage cases).

 Because Fayette was not liable for past due bills, its breach of the contract's
exclusivity provision should be interpreted as a default; thus, the paragraph seven billing provision
is inapplicable. However, because paragraph thirteen concerns only the method of discounting
future profits to present value, it cannot serve as the basis for calculating prejudgment interest. 
Instead, we hold that the default rate of 6% set by section 302.002 of the Texas Finance Code
controls. See Tex. Fin. Code Ann. § 302.002. The relevant portion of the Finance Code states
that interest commences on the earlier of the date suit is filed or the 180th day after a party
receives notice of a written claim. Id. § 304.104. We also conclude that the trial court correctly
determined that accrual of interest should commence from the date suit was filed. See Johnson
& Higgins, 962 S.W.2d at 531. CIS's prejudgment interest issues are therefore overruled.



Conclusion

 Having found no reversible error on the issues of novation, mitigation, and
prejudgment interest, we affirm the judgment of the district court.



 

 Mack Kidd, Justice

Before Justices Kidd, Yeakel and Jones*

Affirmed

Filed: January 11, 2001

Do Not Publish


















* Before J. Woodfin Jones, Justice (former), Third Court of Appeals, sitting by assignment. See
Tex. Gov't Code Ann. § 75.003(a)(1) (West 1998).

1. The record does not indicate that the trial court ruled on the motion. Furthermore, even if
the court had rendered an order, "where a motion for summary judgment is denied by the trial
judge and the case is tried on its merits, the order denying the motion for summary judgment is
not reviewable on appeal." Horton v. Horton, 965 S.W.2d 78, 88 (Tex. App.--Fort Worth 1998,
no pet.). 


o which the damages apply, instead of 6% from
the date the lawsuit was filed, as specified in the modified final judgment. CIS bases its claim on 
paragraph seven of the October contract, titled "Billing," which reads in part: "Client will pay CIS
in full for previous month services within fifteen (15) days of receipt of each monthly statement. 
All past due amounts bear interest at the highest rate permitted by law pa